IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 3, 2010 Session

**KRISTEN COX MORRISON v. PAUL ALLEN ET AL.**

**Appeal by Permission from the Court of Appeals, Middle Section**
**Chancery Court for Davidson County**
**No. 05-1489-1     Claudia Bonnyman, Chancellor**

---

**No. M2007-01244-SC-R11-CV - Filed February 16, 2011**

---

After the death of her husband, the plaintiff filed suit against their agents/financial planners based upon several theories of recovery in regard to the termination of a life insurance policy from one company and the acquisition of a replacement policy from a second company. After initially contesting the award of benefits, the second company, which was also named as a defendant in the suit, settled with the plaintiff. At the conclusion of the bench trial as to the liability of the agents, the plaintiff was awarded substantial damages as to each policy based upon various theories of recovery: the agents' failure to procure a life insurance policy as directed, negligence, negligent misrepresentation, breach of fiduciary duty, and violation of the Tennessee Consumer Protection Act. The Court of Appeals affirmed in part, but held that the damages in contract relating to the failure to procure should be offset by the amount of the plaintiff's pre-trial settlement with the second insurance company. Because of the nature of the issues presented, this Court granted permission to appeal. As to the policy for which benefits were denied by the second company, we hold that (1) a cause of action may arise for the failure of the agents to procure a policy not subject to contest; (2) the claim for failure to procure may be actionable, notwithstanding the policy holders' admission that they did not read the insurance application; and (3) because the settlement by the second life insurance company was not specifically resolved based upon contract, the agents are not entitled to a credit against damages caused by their failure to procure. As to the policy terminated by the plaintiff, we hold that the evidence preponderates against any award of damages based upon negligence, negligent misrepresentation, breach of fiduciary duty, or violations of the Tennessee Consumer Protection Act. Finally, we hold that the ad damnum clause in the complaint provided the agents with sufficient notice to support a damage award in the amount of $1,000,000 plus pre-judgment interest. The judgment of the Court of Appeals is affirmed in part and reversed in part, and the cause is remanded to the trial court for determination of post-judgment interest.

1

**Tenn. R. App. P. 11; Judgment of the Court of Appeals is Affirmed in Part,
Reversed in Part, and Remanded**

GARY R. WADE, J., delivered the opinion of the Court, in which JANICE M. HOLDER and
SHARON G. LEE, JJ., joined. CORNELIA A. CLARK, C.J. and WILLIAM C. KOCH, JR., J., filed
separate opinions concurring in part and dissenting in part.

William Ray Hannah, John Gerald Jackson, Richard W. Bethea, David A. Love, and William
M. Barker, Chattanooga, Tennessee, and Peter Harwood Curry, Nashville, Tennessee, for the
appellants, Paul Allen, Jody Roberts, and Wiley Bros.-Aintree Capital, LLC.

Donald N. Capparella, Amy J. Farrar, and Candi Renee Henry, Nashville, Tennessee, for the
appellee, Kristen Cox Morrison.

**OPINION**
**Facts and Procedural Background**

Kristen Scott Morrison (the "Plaintiff"), the widow of Howard Morrison
("Morrison"), filed suit against the defendants Paul Allen ("Allen"), Jody Roberts
("Roberts"), and Wiley Brothers-Aintree Capital, LLC ("Wiley Brothers"), a Nashville
financial planning firm (referred to collectively as the "Defendants"), alleging various
theories of recovery in regard to two life insurance policies issued to Morrison prior to his
death. American General Life Insurance Company ("American General") was also named
as a defendant but settled the Plaintiffs' claims prior to trial. The case against the Defendants
proceeded to trial without a jury.

The proof established that in 2000, Morrison obtained a $300,000 term life insurance
policy with First Colony, naming the Plaintiff as the beneficiary. This policy contained an
"incontestability clause," meaning that after two years the insurance company could not deny
coverage because of misrepresentations made in the application or any other failure to
comply with conditions in the insurance contract.[1] Shortly after the second anniversary of
the First Colony policy, Morrison was convicted of driving while impaired ("DWI"), which
resulted in restrictions on his license to operate a vehicle.

In late 2002 or early 2003, Morrison began to play golf regularly with Roberts at the
Richland Country Club. Eventually, the Morrisons joined the club and developed a
friendship with Roberts and Allen, who worked together at Wiley Brothers as certified

---

[1] See Searcy v. Fid. Bankers Life Ins. Co., 656 S.W.2d 39, 40 (Tenn. Ct. App. 1983) (stating
that an incontestability clause "preclud[es] the raising of the defense that an insurance policy is
invalid").

2

financial planners. On January 29, 2004, Morrison met with Allen and Roberts seeking counseling on his family's finances. He expressed particular concern that his $300,000 First Colony policy was inadequate. As a part of their professional services, Allen and Roberts agreed to arrange alternatives to the existing policy and to otherwise offer financial planning advice to the Morrisons. On February 10, less than two weeks later, Roberts met with the Morrisons a second time and recommended $1,000,000 in life insurance coverage for Morrison and a $250,000 life insurance policy for the Plaintiff, who had no life insurance at that time. Based upon the information Morrison had provided at the January 29 meeting, Roberts had acquired quotes from various life insurance companies, including American General. The proposed premium for the $1,000,000 and $250,000 "Renewable Level Benefit Term" policies with American General was less than the premium for the $300,000 term policy with First Colony. While Allen and Roberts advised the Morrisons to maintain the First Colony coverage until they had acquired the American General policy, their recommendation was not based on the incontestability clause in the First Colony policy.

Allen, who undertook the responsibility for preparing the insurance applications based on the information received by Roberts at the initial meeting with the Morrisons, telephoned the Plaintiff, asking for additional data. According to the Plaintiff, Allen asked only for her driver's license number and her son's Social Security number. She specifically recalled that Allen did not ask any questions pertaining to her driving record, her tobacco use, or her medical records and further testified that neither Allen nor Roberts directly contacted Morrison after the second meeting. At some point between February 11 and February 27, shortly after the telephone conversation between the Plaintiff and Allen, Allen and Roberts mailed several documents to the Morrisons, including the two completed life insurance applications. The Plaintiff testified that no instructional cover letter accompanied the applications, although Allen, while having no recollection of any cover letter to the Morrisons, claimed that it was his typical practice to provide one. "Sticky notes" attached to the paperwork directed the Morrisons to "sign here." The Plaintiff explained that "[e]verything was just filled out . . . . [s]o it was obvious that Jody and Paul had done everything for us and all we needed to do was sign." On February 27, 2004, the Morrisons signed as directed. The Plaintiff acknowledged at trial that neither she nor her husband read the content of the applications. While Roberts claimed to have witnessed the signing of the applications, the Plaintiff insisted that Roberts had not done so, having never been to her residence until he delivered the completed policies sometime later.

On page four of "Part A" of the application form for the $1,000,000 policy, Morrison signed a lengthy series of authorizations and acknowledgments, which included the following statement:

I have read the above statements or they have been read to me. They are true

3

and complete to the best of my knowledge and belief. I understand that this application: (1) will consist of Part A, Part B, and if applicable, related forms; and (2) shall be the basis for any policy issues. I understand that any misrepresentation contained in this application and relied on by the Company may be used to reduce or deny a claim or void the policy if: (1) it is within its contestable period; and (2) such misrepresentation materially affects the acceptance of the risk.

Morrison also signed several additional documents, including a "Notice Regarding Replacement," which provides as follows:

Are you thinking about buying a new life insurance policy and discontinuing an existing one? If you are, your decision could be a good one–or a mistake. You will not know for sure unless you make a careful comparison of your existing benefits and the proposed benefits.

Make sure you understand the facts. You should ask the company or agent that sold you your existing policy to give you information about it. You are urged not to take action to terminate, assign, or alter your existing life insurance coverage until you have been issued the new policy, examined it and have found it acceptable.

Hear both sides before you decide. This way you can be sure you are making a decision that is in your best interest.

The application included bold lettering:

IF YOU SHOULD FAIL TO QUALIFY FOR THE LIFE INSURANCE FOR WHICH YOU HAVE APPLIED, YOU MAY FIND YOURSELF UNABLE TO PURCHASE OTHER LIFE INSURANCE OR ABLE TO PURCHASE IT ONLY AT SUBSTANTIALLY HIGHER RATES.

We are required by law to notify your existing company that you may be replacing their policy.

Unlike the items in the lengthy list of authorizations and acknowledgments in "Part A" of the application, the "Notice Regarding Replacement" was a separate sheet of paper with no additional language. On page four of Part A to the form, Allen's signature appears, attesting the following statements: "I certify that the information supplied by the proposed insured(s)/owner has been truthfully and accurately recorded on the Part A application."

4

On May 7, 2004, Dywanna Hinds, a nurse, traveled to the Morrison residence to ascertain their medical history, to conduct physical examinations, and to otherwise complete their applications for life insurance with American General. She recorded Morrison's weight, height, blood pressure, and pulse rate, and also obtained blood and urine samples. When asked by Nurse Hinds about his driving record, Morrison answered "yes" to the following question: "In the past 5 years, have you had a moving violation or your driver's license restricted, suspended or revoked?"

Ultimately, American General issued the policies, and Morrison then permitted his First Colony policy to lapse. Two months later, Morrison was critically injured in a single-car accident. He died on the next day. When the Plaintiff made a claim for benefits, American General denied coverage because of an incorrect answer to Question 17E in the application: "In the past five years, have any proposed insureds been charged with or convicted of driving under the influence of alcohol or drugs or had any driving violations?" "No" was the answer appearing on the form.

Later, the Plaintiff filed this suit against American General, alleging breach of the life insurance contract, violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. §§ 47-18-101 to -130 (2001 & Supp. 2010), and general negligence. As indicated, the Plaintiff also named Allen, Roberts, and Wiley Brothers as defendants.[2] Prior to trial, the Plaintiff settled her claim against American General for $900,000. The Plaintiff proceeded to trial against the Defendants, asserting the following theories of recovery: (1) a breach of contract claim for failure to procure an enforceable insurance policy; (2) tort claims for the breach of fiduciary duty, negligence, negligent misrepresentation; and (3) a claim under the Tennessee Consumer Protection Act for "reckless and unfair and deceptive practices."

In a bench trial, the Plaintiff described her husband as scrupulously honest, contending that if Allen and Roberts had inquired, Morrison would have answered question 17E truthfully. She testified that Morrison, although embarrassed about his driving record, had candidly informed both his employer and his friends of his DWI conviction. As support for her contention that Morrison would have answered honestly if asked about his driving record, the Plaintiff pointed to the answers that he had given in response to questions posed by Nurse Hinds during the medical examination she conducted prior to the issuance of the American General policy. The Plaintiff also pointed to other errors, inaccuracies, and misstatements in the application process. For example, Allen acknowledged that he did not ask Morrison

---

[2] The Plaintiff also sued the Allen and Roberts Group, a title listed on the Defendants' business cards; however, no such legal entity existed, and it is undisputed that Allen and Roberts were employed by Wiley Brothers.

Question 15, which required the disclosure of any existing life insurance policies, but he described his omission as simply a "mental block." Allen answered "not applicable" to this question, despite the fact that he was fully aware that Morrison had an existing policy with First Colony. Further, another question in the application was whether Morrison had used tobacco products; even though Roberts had seen Morrison smoke cigars, the answer supplied was "No." The Plaintiff pointed out that Morrison had responded "Yes" to a similar question in the application he made for the First Colony policy.

In response, Allen claimed that he had twice asked Morrison question 17E and that he answered "no" on each occasion. He contended that the question was first asked at the conclusion of their initial meeting on January 29. Allen asserted that he asked again in a later telephone conversation with Morrison. While Roberts claimed to have witnessed the first question and answer session with Morrison and was aware that Allen had later talked with Morrison by telephone, he conceded that he did not hear Allen ask question 17E during the second occasion.[3] There was no reference to either the question or the answer to 17E in the office file maintained at Wiley Brothers.

At the conclusion of the proceedings, the trial court, finding that the Defendants had collectively breached their employment contract by failing to procure an enforceable life insurance policy, awarded the Plaintiff damages of $1,000,000, plus pre-judgment interest for a total of $1,247,120.94. The trial court also awarded the Plaintiff damages in tort in the amount of $300,000 for the loss of the First Colony life insurance policy based on theories of breach of fiduciary duty, negligence, and negligent misrepresentation. Because "the tortious actions of the defendants were willful and knowingly reckless, and deceptive, and in violation of the Tennessee Consumer Protection Act," the trial court doubled the award to $600,000, see Tenn. Code Ann. § 47-18-109(a)(3) (2001), granted pre-judgment interest in the amount of $74,135.38, and awarded attorney's fees and costs totaling $198,285.47. The trial court found no comparative fault on the part of the Morrisons or American General.

Of note, the trial court made specific findings of fact as to the credibility of Allen and the recklessness of the Defendants' conduct:

The Court must find that Mr. Allen is not a credible witness in regard to the

_____

[3] The Court of Appeals correctly noted that if Morrison had so answered, he would have technically been correct, because he was convicted of driving while impaired – a separate offense from driving under the influence. See Tenn. Code Ann. §§ 55-10-401 & 418(a) (2008); State v. Humphreys, 70 S.W.3d 752, 763 (Tenn. Crim. App. 2001). The trial court did not consider the distinction to be relevant or material. Roberts claimed that when asked, Morrison answered "that he did not have a DUI (driving under the influence) in the past."

applications and application process. The Court must find that both Mr. Roberts and Mr. Allen were reckless in their processing of the application and their attempt to purchase life insurance for Howard Morrison, and in the sales process and the fiduciary process in which their relationship was established.

Mr. Allen and Mr. Roberts had a duty to the Morrisons and they failed to fulfill their duty and fell below the standard of care for insurance agents and fiduciaries hired to buy a policy for their clients.

The Court of Appeals affirmed, in part, holding that, as to the American General policy, the evidence did not preponderate against the trial court's finding that the Defendants had failed to ask Morrison to answer question 17E:[4]

Mr. Morrison was asked if he had a restricted driver's license. The nurse correctly marked the answer as "yes." This is a clear indication that Mr. Morrison was not trying to hide his conviction since the conviction is what led to the restricted license. Furthermore, the evidence shows that the entire application process was marked by an inattention to detail and casual attitude toward accuracy on the part of Allen and Roberts. For example, Roberts had seen Mr. Morrison smoke cigars, yet the brokers marked "no" on the application question regarding use of tobacco products. Roberts and Allen knew that Mr. Morrison had an insurance policy and intended to replace it with the new policy, but on the application they indicated that Mr. Morrison had no existing coverage. Allen never asked Mrs. Morrison any questions from the application except for a brief phone call during which he asked for her drivers license and social security numbers. He got the rest of her information from Mr. Morrison. Yet, Allen certified that he personally saw the proposed insured on the date of the application, asked each question and accurately recorded the answers.

Morrison v. Allen, No. M2007-01244-COA-R3-CV, 2009 WL 230220, at *3 (Tenn. Ct. App. Jan. 30, 2009). The Court of Appeals, citing controlling precedent, specifically observed that

---

[4] The Court of Appeals agreed with the findings of the trial court regarding Allen's credibility and the issue of Robert's and Allen's agency. Both of these determinations are questions of fact. See, e.g., State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (stating that issues involving witness credibility are to be resolved by the trial judge as the trier of fact); White v. Revco Disc. Drug Ctrs., Inc., 33 S.W.3d 713, 723 (Tenn. 2000) (noting that the existence of agency "is a question of fact under the circumstances of the particular case"). The evidence does not preponderate against these findings. See Tenn. R. App. P. 13(d).

7

the failure of the Morrisons to read the insurance application did not absolve the Defendants of liability as their agents, id. at *4, but disagreed with the trial court's failure to permit as a credit the settlement by American General, reducing the award by $900,000. Id. at *7. As to the judgment of $300,000 for the loss of the First Colony policy, the Court of Appeals ruled that the Defendants were liable for breach of fiduciary duty, negligence, and negligent misrepresentation, id. at *8-9, and also upheld the trial court's ruling "that the tortious actions of the defendants were willful and knowingly reckless, and deceptive" in violation of the TCPA, holding that doubling the $300,000 award was appropriate under the statute. Id. at *9, *11. While denying the Plaintiff's request for attorneys' fees on appeal, the Court of Appeals did not disturb the attorneys' fees awarded at trial, but ordered a remand for a recalculation of pre- and post-trial interest and attorneys' fees. Id. at *11.

This Court granted the Defendants' application for permission to appeal in order to address the following issues: (1) whether a cause of action may arise for failure to procure an insurance policy not subject to contest; (2) whether the claim is actionable notwithstanding the policy holders' admission that they did not read their insurance applications; (3) whether the settlement by American General was properly applied as a credit against damages caused by the Defendants for their failure to procure; (4) whether the evidence preponderates against any award of damages based upon negligence, negligent misrepresentation, breach of fiduciary duty, or violations of the Tennessee Consumer Protection Act as to the policy terminated by the Plaintiff; and (5) whether the ad damnum clause in the complaint provided the Defendants with sufficient notice to support a damage award in the amount of $1,000,000 and pre-judgment interest.

## ANALYSIS
### Standard of Review

In a civil case heard without a jury, the trial court's findings of fact are presumed to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); Langschmidt v. Langschmidt, 81 S.W.3d 741, 744 (Tenn. 2002). When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witness' demeanor and to hear in-court testimony. Estate of Walton v. Young, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting Randolph v. Randolph, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. Wells v. Bd. of Regents, 9 S.W.3d 779, 783 (Tenn. 1999). Questions of law are subject to de novo review with no presumption of correctness. Seals v. H & F, Inc., 301 S.W.3d 237, 241 (Tenn. 2010); Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008) (citing Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003)).

8

## I. FAILURE TO PROCURE
### A. Applicable Law

A cause of action for failure to procure insurance is separate and distinct from any cause of action against an insurer or a proposed insurer; in a failure to procure claim, "the agent, rather than [the] insurance company, is independently liable." 43 Am. Jur. 2d Insurance § 163 (2003); cf. Haeuber v. Can-Do, Inc., II, 666 F.2d 275, 280 (5th Cir. 1982) (quoting Karam v. St. Paul Fire & Marine Ins. Co., 281 So. 2d 728, 730-31 (La. 1973) ("The [insured] may recover from the agent the loss he sustains as a result of the agent's failure to procure the desired coverage if the actions of the agent warranted an assumption by the client that he was properly insured in the amount of the desired coverage.")). An agent or broker is liable for failure to procure "on the theory that he or she is the agent of the insured in negotiating for a policy, and owes a duty to the principal to exercise reasonable skill, care, and diligence in effecting the insurance." 43 Am. Jur. 2d Insurance § 163 (citations omitted). While other jurisdictions and secondary authority generally recognize that a failure to procure claim may be based on either negligence or breach of contract, see Eddy v. Republic Nat'l Life Ins. Co., 290 N.W.2d 174, 177 (Minn. 1980); Herdendorf v. Geico Ins. Co., 909 N.Y.S.2d 277, 279 (N.Y. App. Div. 2010); Robin Cheryl Miller, Annotation, Liability of Insurance Agent or Broker on Ground of Inadequacy of Liability-Insurance Coverage Procured, 60 A.L.R. 5th 179-85 (1998), we limit our discussion in this case to the latter.

Although this Court has never definitively laid out the requisite elements of a cause of action for failure to procure, American Jurisprudence 2d lists them as follows:

> (1) an undertaking or agreement by the agent or broker to procure insurance;
> (2) the agent's or broker's failure to use reasonable diligence in attempting to place the insurance and failure to notify the client promptly of any such failure; and
> (3) that the agent's or broker's actions warranted the client's assumption that he or she was properly insured.

43 Am. Jur. 2d Insurance § 163 (citation omitted). We adopt these criteria as essential to support a claim for failure to procure insurance.

Our courts have consistently recognized the right to recover damages based on an agent's wrongful failure to procure insurance as authorized or directed. Damages based upon a theory of failure to procure have been awarded in Tennessee when no insurance was acquired by the agent as directed. In Glisson v. Stone, 4 Tenn. App. 71 (1926), Glisson contracted with Stone, a banker and "licensed insurance solicitor," to obtain fire insurance on three tobacco barns. After providing assurances that he would fill out the application later, Stone obtained Glisson's signature on a blank form, but failed to include one of the

9

three barns on the request for coverage. Before Glisson received a copy of his insurance policy, the barn that had not been included in the application was destroyed in a fire. Id. at 71-72. The Court of Appeals ruled that Glisson was entitled to the coverage intended, plus interest, because he, an "amateur," had a "lack of opportunity for examination when [the application] was signed" and had properly "relied on [Stone] who had much more knowledge as to the matter in hand." Id. at 79. Similarly, in Massengale v. Hicks, 639 S.W.2d 659 (Tenn. Ct. App. 1982), the insurance agent assured Massengale on two separate occasions that he would procure a replacement automobile insurance policy. He failed to do so, and less than twenty-four hours after the policy expired, Massengale was involved in an automobile accident. Id. at 660. The Court of Appeals permitted recovery from the agent because Massengale had relied upon the agent's promise to procure full insurance coverage. Id. (recognizing the "universal general rule that an agent or broker of insurance who, with a view to compensation for his services, undertakes to procure insurance for another, and unjustifiably and through his fault or neglect, fails to do so, will be held liable for any damage resulting therefrom").

Recovery under a failure to procure claim has also been extended to instances where coverage was acquired, but was inadequate in light of the agreement between the insured and the agent. For example, in Bell v. Wood Insurance Agency, 829 S.W.2d 153 (Tenn. Ct. App. 1992), the Court of Appeals affirmed a judgment in favor of Bell because the agent, directed to obtain a $30,000 policy for theft, acquired coverage of only $1,000. Our intermediate appellate court rejected a claim by the agent that the Bells' superficial examination of the policy barred recovery, holding that "[m]ere failure to read and understand a policy may not be utilized to otherwise defeat a policy-holder's claim [and] the issue in cases of this nature is not only what the policy provides, but what the agent promised." Id. at 154 (citations omitted).

Based upon the principles announced in these cases, we hold that if an agent undertakes to obtain an insurance policy for an insured, and the policy obtained is contestable due to the acts or omissions of the agent, then the applicant has the same right to recover for failure to procure as he or she would have had if no policy had issued at all. For the identical reason, if only a portion of the insurance policy is subject to forfeiture due to the acts or omissions of the agent, then the applicant has the same right to recover for failure to procure as he or she would have had if the coverage had been less than that sought.

In his separate opinion, Justice Koch asserts that there must be evidence that an insured contracted for an "immediate incontestability clause," or that an insurance agent represented that an insurance policy would be incontestable, in order to support a failure to procure claim under circumstances similar to those before us. We disagree. If an insured contracts with an agent to procure an insurance policy and reasonably relies upon the agent,

based upon his or her expertise, to successfully complete the groundwork for procuring the policy, and the policy is successfully contested by the insurance company due to the acts or omissions of the agent, the insured has not, in fact, received the benefit of the bargain. Insurance that is obtained but later voided because of acts or omissions by an agent is just as worthless as no insurance or inadequate insurance.

A cause of action for failure to procure, therefore, may arise where coverage is denied by the insurer on a policy that is contestable as a result of the acts or omissions of the agent. There is no distinction between an agent's procurement of coverage that is contestable by the insurer and an agent's failure to procure at all. Cf. Bill Brown Constr. Co. v. Glen Falls Ins. Co., 818 S.W.2d 1, 11-12 (Tenn. 1991) (holding that "[r]egardless of which language is selected by the insurer, the insured has a valid right to expect coverage as promised by the insurer's agent," and declining to distinguish between coverage that was never issued and coverage that was, by its terms, inherently subject to forfeiture if the insured ever sought to use it).

Given the circumstances of this case, we must consider these failure to procure cases in light of the law in Tennessee providing that a misrepresentation by an applicant for coverage may be grounds for an insurer to later rescind the policy. Although Tennessee Code Annotated section 56-7-103 (2008) generally favors the validity of insurance contracts, it also states that a written or oral misrepresentation in an application for insurance may defeat the policy if it "is made with actual intent to deceive" or "the matter represented increases the risk of loss [to the insured]." While the truthfulness or falsity of a statement is a question of fact, whether "the false answers materially increased the risk of loss [is] a question of law." Womack v. Blue Cross & Blue Shield of Tenn., 593 S.W.2d 294, 295 (Tenn. 1980). The Court of Appeals has observed that it is "a matter of common sense . . . that persons with [driving under the influence] convictions have a higher risk of death, especially deaths caused by automobile accidents," and, therefore, the false answer would be material. Smith v. Tenn. Farmers Life Reassurance Co., 210 S.W.3d 584, 591 (Tenn. Ct. App. 2006). This suggests that the false answer to Question 17E materially increased the risk of loss, thereby rendering the policy contestable under the statute.

While acknowledging the distinction between a direct claim against an insurer and a claim for failure to procure, the Defendants ask that our holding in Beasley v. Metropolitan Life Insurance Co., 229 S.W.2d 146 (Tenn. 1950), be extended to these circumstances. In Beasley, this Court ruled that a material misrepresentation on an insurance application signed by the applicant may support a later denial of coverage by the insurer, even where the applicant claims to have been unaware of the misrepresentation. Id. at 148. In addressing a suit by the insured directly against the insurer, and not involving a claim against an agent for failure to procure, this Court observed that contract principles placed a duty on Beasley

to "learn the contents of a written contract" before signing and, in consequence, he could not sustain a claim against the insurer.  Id.

The Court of Appeals has narrowly interpreted Beasley, limiting the holding to its facts.  For example, in Giles v. Allstate Insurance Co., 871 S.W.2d 154, 156-57 (Tenn. Ct. App. 1993), a case involving similar circumstances and a direct claim against the insurer, our intermediate appellate court held that the insured, who contended that the insurer's agent had filled out the application incorrectly and that she had signed it without reading it, was nevertheless responsible for the material misrepresentations therein that increased the insurer's risk of loss.  See also Tenn. Farmers Life Reassurance Co., 210 S.W.3d at 591; Montgomery v. Reserve Life Ins. Co., 585 S.W.2d 620, 622 (Tenn. Ct. App. 1979).  But see Berryhill v. Mut. Benefit Health & Accident Ass'n, Omaha, Neb., 262 S.W.2d 878 (Tenn. Ct. App. 1953).  Under slightly different circumstances, however, the Court of Appeals has permitted recovery in favor of an insured against an insurer.  See Bland v. Allstate Ins. Co., 944 S.W.2d 372, 378 (Tenn. Ct. App. 1996) (granting recovery where the insured had signed a blank application and the insurer's agent subsequently filled out the application erroneously).  In summary, direct suits by an insured against the insurer have produced mixed results, depending largely upon the facts.

## B.  Analysis

In the case before us, the question is whether the Plaintiff may recover from the Defendants who, as the Morrisons' agents, failed to procure a life insurance policy which could not be contested by the insurer.  Specifically, we must determine whether the Defendants failed to ask and accurately record the answer to the key question, 17E, that rendered the policy contestable and resulted in the Plaintiff's inability to receive benefits under the policy.  This issue is one of first impression in the context of an insured's failure to read the contents of an application prepared by the agents of the insured.

Our preliminary observation is that the best practice is to always read every word of every document before signing.  An applicant who embraces the tedious but important task of reviewing the terms of an insurance application is likely to avoid disputes of this nature. Furthermore, while many of the terms of this particular application would be difficult for a layperson to comprehend, question 17E is quite clear: "In the past five years, have any proposed insureds been charged with or convicted of driving under the influence of alcohol or drugs or had any driving violations?"  Had Morrison seen this question and corrected the answer, this litigation might have been avoided.

Nevertheless, the failure to read does not insulate agents from a suit based upon the procurement of a contestable policy.  The determination of whether the failure to read bars recovery is, as indicated, a fact-intensive inquiry.  However, when an applicant applies for

an insurance policy and the agent undertakes to fill out the application on his or her behalf, the applicant should be able to trust that the agent will ask the important questions and accurately record the answers to them so that the policy cannot later be successfully contested based on inaccuracies. Here, the Morrisons justifiably relied upon the Defendants to execute this task. The Plaintiff testified that the Defendants never went over the questions on the life insurance policy in person or on the phone. She specifically recalled that when the applications arrived in the mail, they were in a package containing the Morrisons' paperwork for their college savings plan and their mutual fund, all of which where filled out and all of which had "sticky notes" attached directing them where to sign. There was no cover letter with instructions or correspondence from the Defendants. And while Morrison had time to review the completed application and seek clarification as to any of the terms, the Plaintiff's testimony that "it was obvious that [the Defendants] had done everything for us and all we needed to do was sign" and that she "had no idea that there were questions on the application" was accredited by the trial court.

Further, we conclude that there is ample evidence to support the trial court's determination that Morrison was never asked about his driving record and that the Defendants' failure to do so resulted in a policy that was successfully contested by American General. Although Allen claimed to have asked Morrison question 17E, the trial court specifically chose not to believe Allen's testimony, finding that he was not a credible witness. Further, the trial court accredited the Plaintiff's contention that her husband would have answered honestly if asked, observing that he had candidly informed his friends and his employer about the conviction and the restricted license. That Morrison honestly answered a question about his driving history during the medical examination, which was required before the issuance of the policy, bolstered the Plaintiff's account of the events. The evidence demonstrated that the application, as filled out by the Defendants, was done so in a careless manner and contained information known to them to be false. While Allen admitted to knowing that the Morrisons had an existing life insurance policy, on the actual application he had drawn a line through the question asking if the applicant had an existing policy, describing the omission as "just a mental block." He also answered "no" to a question on the Agent's Report asking if the proposed insured had any existing life insurance policies, again describing the mistake as a "mental block." Allen claimed that the question regarding tobacco use on the Plaintiff's application, which was not filled in, was "just a mistake." He answered "yes" to another question on the Agent's Report asking whether he had seen the applicants on the date of the application, asked each question and accurately recorded the answers, but unequivocally admitted that he did not see the Morrisons on the day they signed the applications. Roberts admitted that he did not ask the Plaintiff about her tobacco use or her driving history at the February 10 meeting, and that he "made assumptions about her" and should have instead asked the questions. This evidence lends further credence to the trial court's determination that the erroneous answer in the application was

due to the failure of Allen and Roberts to ask the necessary questions.[5]

These facts, even as accredited, would not satisfy the standard established in Beasley. The basis for our decision in this case, however, is a breach of contract between the agent and the applicant for failure to procure a policy not subject to contest. Beasley dealt with contract formation and was decided on the basis of misrepresentation in the contract between the insured and the insurer. As a result, the holding does not apply to the circumstances before us today.

In light of the foregoing, we agree with the trial court and Court of Appeals that the Plaintiff, regardless of any failure to read the applications, established an actionable claim against their agents for failure to procure. The record includes supporting evidence for each of the requisite elements. Initially, as part of their professional relationship with the Morrisons, the Defendants undertook to procure life insurance; secondly, the Defendants' failure to use reasonable diligence in procuring the life insurance resulted in the issuance of a policy subject to challenge by the insurer; and, finally, the Defendants' actions warranted Morrison's assumption that he had the life insurance coverage sought.

While it is true, as Justice Koch notes in his separate opinion, that an insurance policy was obtained, we disagree that this was the policy for which the Morrisons contracted. It places form over substance to claim that because an insurance policy was obtained, the contractual agreement between the Morrisons and the Defendants could not have been breached. The Morrisons expected that by truthfully answering the questions posed by the Defendants, they would receive a policy based upon the information they provided. By failing to ask question 17E, the answer to which, if accurately recorded, would possibly have changed the nature of the Morrisons' policy with American General by raising their premium, the Defendants did not obtain what was promised. Therefore, the Defendants'

---

[5] Justice Koch determines that the Plaintiff's recovery of one million dollars is justified on a breach of fiduciary duty theory rather than one of failure to procure. While Justice Koch characterizes many of the facts supporting a failure to procure claim as "specific findings of fact . . . with regard to [the Plaintiff's] negligence and breach of fiduciary claims," we do not think the record can be interpreted in this manner. In the trial court's ruling from the bench, it first announced the primary decision, finding the Defendants liable for breach of contract, negligence, and under the TCPA. The court then stated that it would "talk about the fact findings," but did not reference any particular claim. Based on the extensive nature of the court's findings, we find that they related to all of the court's stated bases for finding the Defendants liable, not merely those based in negligence. And while, as Justice Koch asserts, the facts in the record may very well support a finding of breach of fiduciary duty as to the procurement of the American General policy, the trial court found a breach of fiduciary duty based upon the loss of the First Colony policy. Additionally, the Plaintiff has not asked this Court to address whether the Defendants' actions support a finding of breach of fiduciary duty in relation to the procurement of the American General policy.

failure to use reasonable diligence in asking one of the key questions used by American General to determine the type of policy it would issue was a breach of their contractual duty to the Morrisons.

As we have stated, an agent's duty to procure an insurance policy is distinct from the duty of the insurer to pay under its policy and, as a result, that duty gives right to an independent cause of action. We decline the Defendants' invitation to apply the reasoning of Beasley, Giles, or similar cases involving an insurer's denial of benefits to this claim for the failure to procure. Moreover, we disagree with the Defendants that an agent can be negligent in filling out an insurance application and yet be shielded from any liability by the signature of the applicant. "[I]nsurance professionals and other fiduciaries [must be held] to higher standards." Aden v. Fortsh, 776 A.2d 792, 802 (N.J. 2001). Lastly, we disagree with the Defendants' contention that Morrison's failure to proofread his application interfered with their ability to perform their own contractual obligations. See Moody Realty Co. v. Huestis, 237 S.W.3d 666, 678 (Tenn. Ct. App. 2007) (discussing the duty of a party to a bilateral contract not to interfere with the other party's ability to perform its duties). The Defendants' failure to ask Morrison about his driving history is the core concern. As agents employed by the Morrisons for their expertise, the Defendants may not claim any greater duty on their clients' part to anticipate and rectify their errors. Thus, the trial court did not err by granting a judgment in the amount of $1,000,000 plus pre-judgment interest.[6]

## II. CREDIT FROM $900,000 SETTLEMENT

The Defendants also argue that the Court of Appeals properly held that the Plaintiff's award of damages for failing to procure a valid enforceable life insurance policy should have been reduced by the $900,000 settlement from American General. The Plaintiff disagrees. Before deciding whether the Court of Appeals correctly determined that the Defendants were entitled to a credit, however, we must address a threshold issue. That is, the Plaintiff continues to argue that the Defendants waived any entitlement to relief by failing to make a timely offer of proof during the course of the trial.

---

[6] Pursuant to Tennessee Code Annotated section 47-14-123, pre-judgment interest "may be awarded by courts . . . in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." In Myint v. Allstate Insurance Co., we observed that "[i]n reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." 970 S.W.2d 920, 927 (Tenn. 1998). The decision of whether to award prejudgment interest is within the discretion of the trial court and will not be disturbed on appeal "unless the record reveals a manifest and palpable abuse of discretion." Id. We have determined that the trial court's decision to award pre-judgment interest at the rate of ten percent starting thirty days after Morrison's death, which was the date the Plaintiff would have expected to have use of the insurance policy funds, was well within the bounds of its discretion.

Prior to trial, the Plaintiff moved to exclude evidence of the settlement amount paid by American General. The trial court granted the motion. On the third day of trial, the Defendants' counsel, suggesting that an offer of proof was likely necessary on the issue, asked that the court revisit the motion. The following exchange then took place:

THE COURT: [T]he issue of credit is a real issue which should be addressed along with the settlement <u>after the trial is over and judgments are rendered</u>. . . . I'm not saying that I'm going to grant a credit or a contribution. I'm just saying that <u>the right doesn't arise until after the case is over, judgments are rendered, if there are judgments</u>. And at that point, the Court looks at credits and contributions . . . .

MR. CURRY [attorney for Defendants]: I'm protected. That's all I care about, is at some point, depending on what the Court does, that I will have an opportunity. That's all.

THE COURT: I think you'll have an opportunity to address it.

MR. CURRY: Yes. That's what I mean.

THE COURT: All right.

(Emphasis added).

On March 8, 2007, the trial court entered an order of final judgment. The Defendants filed a motion to alter or amend and reopen proof, contending they were entitled to a credit against the judgment. <u>See</u> <u>Simpson v. Frontier Cmty. Credit Union</u>, 810 S.W.2d 147, 149 (Tenn. 1991) (noting that after the proof is closed, the trial court has the discretionary authority to permit additional proof). The trial court denied the motion, noting that the Defendants "had the opportunity to make an offer of proof during the trial . . . to contend that the [P]laintiff had mitigated her damages by settling with American General . . . and chose not to do so." Further, the trial court found that the Defendants did not have a legal basis for the credit, as they were "independently liable for their own acts and omissions."

The Court of Appeals observed that the "Defendants' counsel was obviously trying to avoid the very situation in which he now finds himself – justifying why he made no offer of proof." <u>Morrison</u>, 2009 WL 230220, at *6. While noting that the better practice would have been for the Defendants to have made an offer of proof during the trial, our intermediate appellate court pointed out that the trial court had directed the Defendants to present their proof after the trial had ended, which is exactly what they did. The Court of Appeals ruled

-16-

that, under these circumstances, the issue could not be treated as waived, and then examined the settlement document, which had been filed under seal.[7] In our view, the Court of Appeals properly ruled that the issue had not been waived and that the trial court should have considered the settlement document.

The issue of substance, of course, is whether the Defendants were entitled to a credit in the amount of the Plaintiff's settlement with American General. The Defendants argue that the Plaintiff was only damaged "to the extent that she did not receive the proceeds of the American General policy," and, because she received $900,000 of the one million dollar policy, she is only entitled to an additional $100,000. See Metro. Gov't of Nashville & Davidson Cnty. v. Cigna Healthcare of Tenn., Inc., 195 S.W.3d 28, 35 (Tenn. Ct. App. 2005) ("The purpose of assessing damages in the event of a breach of contract is to place the injured party in the same position it would have been in had the contract been fully performed.").

The Court of Appeals agreed, relying upon the general principle that "'[w]here a coverage action against an insurer is joined with an action against an insurance agent or broker for failure to procure coverage, establishing the liability of either defendant generally will exonerate the other.'" Morrison, 2009 WL 230220, at *7 (quoting Robert Michael Ey, 14 Causes of Action 881 § 3 (2008)). The Court of Appeals held that an agent who owes a duty to the insured may remain personally liable in tort for his or her failure to procure insurance, even where the insured has settled with the insurer, but if liability is based in contract, as in the case before us, the agent is entitled to have damages reduced by the settlement amount. Id.

In this appeal, the Plaintiff maintains that because the Defendants' liability for failure to procure is separate and distinct from American General's liability for failure to pay, the Defendants are not entitled to a credit for the settlement amount. Initially, we acknowledge that the Defendants were agents of the Morrisons, not agents of American General. The trial court specifically found that Allen and Roberts "owe[d] their undivided loyalty" to the Morrisons at the time they applied for the insurance policies. The Court of Appeals concurred, observing that Roberts and Allen were employed by the Morrisons to acquire a new one million dollar life insurance policy, that the Morrisons had relied on their "superior knowledge," and that the Defendants had breached their duty to procure an enforceable insurance policy. Id. at *4. In our view, the evidence clearly demonstrates that the Defendants' duty to the Morrisons was separate and distinct from any duty owed them by

---

[7] The "General Release and Receipt" releases American General "from any and all claims, demands causes of action, suits, proceedings, actions, liabilities, damages, debts, judgments, costs, fees, and expenses of every kind and nature . . . relating to claims in the matter of the arbitration" in this case.

American General. As indicated, the Defendants' liability stemming from this independent duty is also separate and distinct from that of American General. See Clear-Vu Packaging, Inc. v. Nat'l Union Fire Ins. Co., 434 N.E.2d 365, 368 (Ill. App. Ct. 1982) (determining that the insurance company's failure to pay on the insurance policy caused injury to the plaintiff that was separate from that which resulted from the agent's failure to procure the policy).

Despite the separate liabilities of the Defendants and American General in this setting, we recognize that the purpose of damages for breach of contract is to place the injured party in the place he or she would have occupied had the contract been fully performed. Cigna Healthcare, 195 S.W.3d at 35. Other jurisdictions typically hold that if the insurance company has settled with the plaintiff on the policy, the agent's or broker's damages may properly be reduced by the settlement amount. See Eddy, 290 N.W.2d at 177 (finding the liability of independent insurance broker to be "limited to the difference between what the plaintiffs have received [per settlement with the insurance company] and the face value of the policy to which they were entitled"); Schurmann v. Neau, 624 N.W.2d 157, 161 & n.4 (Wis. Ct. App. 2000) (noting an insurance agent's independent liability, but stating that "when the insurer provides the same coverage through settlement with the insured as was requested, no action against the agent exists because he has not failed to produce what was promised"). Because this authority is persuasive, it is apparent that under ordinary circumstances, an independent insurance agent who is sued on a breach of contract claim for failing to procure an enforceable insurance policy is entitled to an offset in damages by the insurance company's settlement on the policy.

In each of the instances cited, however, the insurance companies were sued for breach of the contractual terms within the insurance policies and settled upon that basis alone. Eddy, 290 N.W.2d at 176 (settling claims with insurance company based on breach of contract and reformation of contract); Schurmann, 624 N.W.2d at 160 (settling claim with insurance company demanding performance under the policy). American General was sued on multiple theories: violations of the TCPA (which may result in treble damages),[8] negligence,[9] breach

---

[8] The Plaintiff alleged that American General's failure to inquire into Morrison's motor vehicle records, despite its receipt of conflicting answers regarding his driving record contained in the application and Nurse Hinds' medical report, "caused American General to issue what was in effect illusory coverage, for which it accepted a premium without the corresponding requirement of providing coverage." The complaint further asserted that these acts constituted "reckless, unfair, and deceptive acts and omissions" in violation of the TCPA.

[9] The complaint alleged that "American General breached its duty of reasonable care by failing to inquire into the governmental motor vehicle records" in order "to corroborate and verify the answers on . . . Morrison's life insurance policy" and that the "direct and proximate result" was that the Plaintiff was left without effective life insurance in the amount of $1,000,000 and allowed the $300,000 incontestable policy

of contract,[10] and respondeat superior,[11] and entered into a "full, complete and total release of any and all claims asserted or assertable." In addition, at the time of the settlement, no determination had been made regarding whether the Defendants were independent agents. The complaint alleged that the Defendants were, in fact, agents for American General. Therefore, American General was contemplating potential liability for its own acts as well as those of the Defendants.

While distinguishable on a factual level, an opinion rendered by the Washington Court of Appeals provides instruction on this issue. In Pederson's Fryer Farms, Inc. v. Transamerica Insurance Co., the plaintiff, who owned an underground gasoline storage tank insured by Transamerica Insurance Company ("Transamerica"), discovered that the tank was leaking. 922 P.2d 126, 130 (Wash. Ct. App. 1996). After the plaintiff had incurred expenses in cleaning up the contamination caused by the leak, it submitted a claim to Transamerica for the costs. Id. at 131. The plaintiff, who apparently had coverage with two other insurers, settled with them. When Transamerica denied the claim, the plaintiff sued for the cleanup costs. Id. The trial court declined to extend a credit to Transamerica for the settlement amount, and Transamerica challenged this ruling, arguing that the plaintiff would "recover more than it expended in cleaning up the contamination and thus receive an inappropriate 'double recovery.'" Id. at 139. The Court of Appeals affirmed the trial court, observing that "[t]he settlement . . . was not mere payment for [the plaintiff's] cleanup costs; it was in exchange for a release of liability for all past, present and future environmental claims. Transamerica did not demonstrate what part, if any, of the settlement was attributable to cleanup costs." Id.; accord Weyerhaeuser Co. v. Commercial Union Ins. Co., 15 P.3d 115, 126-27 (Wash. 2000) (applying the Pederson's rationale under similar, albeit more complex, factual circumstances).[12]

---

to lapse.

[10] The Plaintiff alleged that "American General breached their contract by accepting premiums from . . . Morrison when it knew or should have known . . . that the answer to Question No. 17E was inaccurate," and that this inaccurate answer could result in the policy being declared void, thereby allowing American General to refuse benefits. Further, the complaint stated that American General's failure to corroborate the information supplied on the insurance policy application caused the loss of the $300,000 policy with First Colony and the denial of benefits under the $1,000,000 American General policy.

[11] The Plaintiff claimed that American General was liable for any acts and omissions on the part of Allen and Roberts and that if they were found liable under the TCPA, American General would be "liable to [the Plaintiff] for treble damages and attorneys' fees."

[12] In her dissent on this issue, Chief Justice Clark states that "Weyerhaeuser does not stand for the proposition that, by suing on multiple theories, and then settling without identifying the legal theory underpinning the settlement, the plaintiff is not subject to the general rule regarding offsets." We do not

We find the Pederson's analysis on the credit issue to be helpful in our analysis. In the Pederson's case, the settlement document released the other insurance companies from all past, present, and future claims of any kind or nature, and Transamerica could not offset its own damages by the settlement amount because it was unable to demonstrate what portion of the settlement related to the clean-up costs at issue. Here, the Plaintiff's settlement agreement also released American General from all past, present, and future claims. While the nature of the claims here and in Pederson's are, of course, distinguishable, American General's potential "present" liability at the time of settlement was extinguished as to the Plaintiff's multiple theories of recovery, not just the breach of contract theory. If American General had been sued solely on a breach of contract theory, the Defendants would clearly have been able to demonstrate that the settlement was made solely on that basis and, accordingly, would be entitled to an offset.[13] We cannot assume, however, from the nature of this agreement, that American General settled solely on the basis of its failure to pay on the insurance policy.

While Chief Justice Clark characterizes the Plaintiff's settlement as stemming solely from American General's failure to pay, this ignores the Plaintiff's claims that American General breached its duty of reasonable care by failing to reconcile the conflicting statements in Mr. Morrison's application and the nurse's report by researching motor vehicle records prior to issuing the policy. While this claim relates to the successful contest of the one million dollar policy on the part of American General, it addresses a wrong that is separate and distinct from American General's failure to pay, and instead involves an "unfair or deceptive act or practice" under the TCPA. As noted, treble damages based upon violations of the TCPA could have far exceeded the one million dollar policy limit. As a result, we cannot say with the same confidence as the Chief Justice that there "is no mystery about what the $900,000 settlement proceeds represent." We think the more plausible assumption to be that the company sought to avoid costly liability at trial that could have been based upon multiple theories of recovery.[14]

_____

claim that Weyerhaeuser explicitly states such a principle. We cite Weyerhaeuser merely to note that the Pederson's analysis has also been utilized by Washington's highest court.

[13] Our holding in Beasley suggests that because an insured who fails to read an insurance contract may be held accountable for a misrepresentation, American General might not have been subjected to liability on a claim for breach of contract.

[14] While Chief Justice Clark contends that our ruling will encourage "a 'kitchen sink' approach to filing complaints," we do not share these concerns. There are procedural and ethical rules in place that will prevent attorneys from attempting to take advantage of our ruling on this issue by including baseless claims in a complaint. See Tenn. R. Civ. P. 8.01 (allowing "[r]elief in the alternative or of several different types [to] be demanded" so long as a litigant makes a showing in the complaint that he or she is "entitled to

As the parties claiming that their damages should have been reduced by the settlement amount, the Defendants had the burden of establishing their right to such a reduction. Cf. Polk v. Torrence, 405 S.W.2d 575, 576 (Tenn. 1966) (finding the general rule to be that "where one claims a setoff the burden of establishing the right of this setoff is upon the one claiming it"); Midwest Bronze, Inc. v. Outlaw Aircraft Sales, Inc., No. 01A01-9707-CH-00358, 1999 WL 92652, at *3 (Tenn. Ct. App. Feb. 24, 1999) (same). The terms of the "General Release and Receipt," the settlement document, control. The Defendants are unable to point to anything in that document demonstrating that American General's payment was to extinguish its liability solely under the breach of contract theory. Because we find that the Defendants have failed to meet their burden of proof, we hold that they were not entitled to a reduction in judgment by the settlement amount.

The Defendants' damages should not have been reduced by the $900,000 settlement with American General; therefore, the appropriate measure of damages for the failure to procure insurance should be the face value of the American General policy. See J. Smith Lanier & Co. v. Se. Forge, Inc., 630 S.E.2d 404, 407 (Ga. 2006) (holding that, under Georgia law, damages against an insurance broker for negligent failure to procure an insurance policy are limited to the amount of the policy); Autumn Ridge, L.P. v. Acordia of Va. Ins. Agency, Inc., 613 S.E.2d 435, 440 (Va. 2005) (holding that "the measure of damages for failure to procure insurance is the amount that would have been due under the policy"); Gothberg v. Nemerovski, 208 N.E.2d 12, 19 (Ill. App. Ct. 1965) ("The measure of damages for the breach of a contract to procure insurance is to be determined by the terms of the policy which the broker failed to procure."); Capital Site Mgmt. Assocs. v. Inland Underwriters Ins. Agency, Ltd., 806 N.E.2d 959, 964 (Mass. App. Ct. 2004) (same). The judgment of the Court of Appeals granting a $900,000 credit is, therefore, reversed, and the judgment of the trial court is reinstated against the Defendants for the full policy amount of $1,000,000.

### III. NEGLIGENCE, NEGLIGENT MISREPRESENTATION AND BREACH OF FIDUCIARY DUTY
#### A. Applicable Law

The Plaintiff also received damages based on the theory that the Morrisons allowed their $300,000 life insurance policy to lapse due to the Defendants' negligence, negligent misrepresentation, and breach of fiduciary duty. The Defendants challenge the propriety of the award. Whether liability can be appropriately based on one or more of these theories

---

relief"); see also Tenn. Sup. Ct. R. 8, RPC 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless after reasonable inquiry the lawyer has a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law.").

depends on a consideration of the requisite elements for each cause of action.

In Giggers v. Memphis Housing Authority, this Court confirmed the elements essential to a recovery based on general negligence:

In order to establish a prima facie claim of negligence, basically defined as the failure to exercise reasonable care, a plaintiff must establish the following essential elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause."

277 S.W.3d 359, 364 (Tenn. 2009) (quoting McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995)).

Negligent misrepresentation, on the other hand, applies to a narrower class of claims. "[T]o succeed on a claim for negligent misrepresentation, a plaintiff must establish 'that the defendant supplied information to the plaintiff; the information was false; the defendant did not exercise reasonable care in obtaining or communicating the information and the plaintiffs justifiably relied on the information.'" Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301, 311 (Tenn. 2008) (quoting Williams v. Berube & Assocs., 26 S.W.3d 640, 645 (Tenn. Ct. App. 2000)). "Tennessee has adopted Section 552 of the *Restatement (Second) of Torts* 'as the guiding principle in negligent misrepresentation actions against . . . professionals and business persons.'" Robinson v. Omer, 952 S.W.2d 423, 427 (Tenn. 1997) (quoting Bethlehem Steel Corp. v. Ernst & Whinney, 822 S.W.2d 592, 595 (Tenn. 1991)). The Restatement (Second) provides as follows:

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977).

Finally, a fiduciary relationship

arises when one person reposes special trust and confidence in another person and that other person – the fiduciary – undertakes to assume responsibility for the affairs of the other party. The person upon whom the trust and confidence

is imposed is under a duty to act for and to give advice for the benefit of the other person on matters within the scope of the relationship.

Overstreet v. TRW Commercial Steering Div., 256 S.W.3d 626, 641-42 (Tenn. 2008) (Koch, J., concurring) (footnotes omitted) (citing McRedmond v. Estate of Marianelli, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000); Restatement (Second) of Torts § 874 cmt. a (1979)). "Proof of damages is an essential element of" a fiduciary duty claim, Union Planters Bank of Middle Tenn. v. Choate, No. M1999-01268-COA-R3-CV, 2000 WL 1231383, at \*3 (Tenn. Ct. App. Aug. 31, 2000), as is causation of damages. See Restatement (Second) of Torts § 874 ("One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." (emphasis added)); 23 Tennessee Practice Elements of an Action § 8:1 (2009) (including damages and proximate cause as elements to the cause of action for fiduciary duty).

## B. Analysis

The Defendants argue that the evidence preponderates against the trial court's finding that they failed to adequately advise the Morrisons about the risks of cancelling their incontestable policy in favor of one subject to contest. The Defendants' initial argument hinges in large part on the "Notice Regarding Replacement" attached to the application, taken from Tennessee Department of Commerce and Insurance Rules "regulat[ing] the activities of insurers and agents with respect to the replacement of existing life insurance." Tenn. Comp. R. & Regs. 0780-01-24-.01 (1985). An agent is required by Rule 0780-01-24-.05(2)(a) to present a "Notice Regarding Replacement" in the form prescribed by Rule 0780-01-24-.12 or some "other substantially similar form approved by the Commissioner." While the notice speaks generally about the need to "understand the facts" and urges the applicant "not to take action to terminate, assign or alter your existing life insurance coverage until you have been issued the new policy, examined it and have found it acceptable," the content does not specifically address the issue of contestability, either with regard to the policy being replaced or the replacement policy. Tenn. Comp. R. & Regs. 0780-01-24-.12 (1985). Upon a review of the evidence as a whole, however, we have concluded that it is not necessary to decide whether such a warning was sufficient to absolve the Defendants of liability for negligence, negligent misrepresentation, or breach of fiduciary duty.

"Causation, or cause in fact, means that the injury or harm would not have occurred 'but for' the defendant's negligent conduct." Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn. 1993). The real question, therefore, is whether the proof establishes that the Morrisons would have allowed their $300,000 policy to lapse "but for" the Defendants' conduct. See Hale v. Ostrow, 166 S.W.3d 713, 718 (Tenn. 2005).

In our view, the Plaintiff simply failed to demonstrate that the Defendants' conduct

caused the loss of the $300,000 policy. During the trial, the Plaintiff testified that she and her husband intended to purchase the American General policy to replace the First Colony policy. She never contended she and her husband, had they known that the First Colony policy was incontestable and the American General policy was not, would have continued to pay the premiums on both policies until the incontestability clause became effective on the latter policy. The Plaintiff, in this appeal, argues that it "[i]t is a reasonable inference from the facts that had the Morrisons been told the true risks of dropping the First Colony policy and starting a new two year contestability period, they would more probably than not have kept both policies in place until the new two year contestability period had elapsed."

We disagree. While some individuals might have chosen to pay the extra premiums for the security of a non-contestable policy, we are not inclined to infer, absent either direct or persuasive circumstantial evidence to the contrary, that the Morrisons would have done so in this instance. The evidence establishes that the primary goal of this transaction was a $1,000,000 life insurance policy on Morrison. While the Plaintiff has convincingly established that she incurred damages from the Defendants' failure to procure an enforceable $1,000,000 policy, she has not demonstrated that the negligence of the Defendants caused an additional $300,000 in damages based upon the cancellation of the First Colony policy. In that regard, the evidence preponderates against the findings of the trial court. The judgment of $300,000 cannot be sustained under a theory of tort.

## IV. TENNESSEE CONSUMER PROTECTION ACT
### A. Applicable Law

The trial court held that the Defendants also violated the TCPA as to the First Colony policy. Tennessee Code Annotated section 47-18-104 prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," classifying such acts as Class B misdemeanors. Tenn. Code Ann. § 47-18-104(a). Section 47-18-104(b) provides a lengthy, non-exclusive list of practices that are "unfair or deceptive" under the TCPA. "[T]he standards to be used in determining whether a representation is 'unfair' or 'deceptive' under the TCPA are legal matters to be decided by the courts. However, whether a specific representation in a particular case is 'unfair' or 'deceptive' is a question of fact." Tucker v. Sierra Builders, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005) (citations omitted). "A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact." Id. An act or practice is unfair where "'the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.'" Id. at 116-17 (quoting 15 U.S.C.A. § 45(n)).

Section 47-18-109(a)(1) creates a cause of action for those who suffer damages as the

result of practices in violation of section 47-18-104:

> Any person who suffers an <u>ascertainable loss of money or property</u>, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, <u>as a result of the use or employment by another person of an unfair or deceptive act or practice</u> declared to be unlawful by this part, may bring an action individually to recover actual damages.

(Emphasis added.) Section 47-18-109(a)(3)-(4) provides enhanced damages for "willful or knowing" violations of the TCPA:

> (3) If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper.

> (4) In determining whether treble damages should be awarded, the trial court may consider, among other things:
>     (A) The competence of the consumer or other person;
>     (B) The nature of the deception or coercion practiced upon the consumer or other person;
>     (C) The damage to the consumer or other person; and
>     (D) The good faith of the person found to have violated the provisions of this part.

## B. Analysis

A claim under the TCPA based on the Defendants' advice to allow the $300,000 First Colony policy to lapse fails for the same reason that the Plaintiff's actions based upon negligence, negligent misrepresentation, and breach of fiduciary duty fail. A private cause of action under the TCPA is only available where a plaintiff can show "ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice." Tenn. Code Ann. § 47-18-109(a)(1). In our view, the Plaintiff was unable to produce evidence to support the theory that she and her husband would have continued to pay the premiums on the First Colony policy, thereby maintaining two separate policies with death benefits totaling $1,300,000. While the evidence was supportive of their failure to procure claim as to the American General policy, that the Morrisons allowed their First Colony policy to lapse does not constitute a "loss of money or property" resulting from any "unfair or deceptive acts" on the part of the Defendants.

Despite the fact that the judgment of the trial court addressed the TCPA claim only

in the context of the First Colony policy, the Plaintiff argues that the Defendants also engaged in various TCPA violations in conjunction with the application for the $1,000,000 American General policy. While the record includes references to the $1,000,000 policy as a violation of the TCPA, the trial court clearly calculated damages only in terms of the value of the First Colony policy. Given this fact, we are not inclined to address whether TCPA damages might alternatively be available based upon any willful and knowing acts of the Defendants regarding the American General policy.

## V.  COMPARATIVE FAULT

The trial court determined that comparative fault should not be allocated to the Morrisons or American General with regard to the Plaintiff's various tort and TCPA claims. The Court of Appeals did not disturb the holding. In this appeal, the Defendants argue that the failure to attribute comparative fault to Morrison and/or American General is erroneous. Because we have determined that causation and damages were not established by the Plaintiff as to her various tort theories or her TCPA claim, and the recovery, as modified by this Court, is based only in contract, it is not necessary for us to address this contention.

## VI.  AD DAMNUM CLAUSE

The Defendants argue that the trial court's award of $1,300,000 in compensatory damages exceeded the amount in the Plaintiff's ad damnum clause, and therefore the judgment was void. The Defendants further contend that "[t]he fact that the Court of Appeals subsequently modified the amount owed by awarding . . . a $900,000 credit for the settlement . . . against the breach-of-contract award does not cure or moot the *ad damnum* problem, because the void judgment remains." The Defendants assert that the Court of Appeals "first should have recognized that the trial court's judgment was void as to the excess $300,000, and *then* proceeded to adjust the breach of contract award based on the $900,000 credit."[15]

It is true that this Court has held that "[a] judgment or decree in excess of the amount pleaded is void," but that is so only "to the extent of the excess." Gaylor v. Miller, 59 S.W.2d 502, 504 (Tenn. 1932). We conclude that the Court of Appeals' application of the $900,000 credit to the breach of contract claim adequately remedied any ad damnum issues, in that this modified the total damages to $700,000 plus pre- and post-judgment interest,

---

[15] The Defendants do not cite any supporting authority for their claim. As a result, the issue has technically been waived. See Tenn. R. App. P. 27(a)(7) (requiring that appellants "include . . . citations to authorities . . . relied on" in arguments asserted in briefs); see also Sneed v. Bd. of Prof'l Responsibility, 301 S.W.3d 603, 617 (Tenn. 2010) (holding that appellant's failure to cite to authority in support of argument waived issue pursuant to Tenn. R. App. P. 27(a)(7)).

which fell well within the damages amount sought in the complaint.[16] Because the Court of Appeals dealt with the credit issue first, it found that it was "unnecessary to address any of the other arguments raised by the appellants." Morrison, 2009 WL 230220, at *11. We agree that, based on the order in which the intermediate court addressed the issues, it was unnecessary to discuss the matter in further detail.

Although we have modified the judgment of the Court of Appeals, the ad damnum clause in the complaint clearly sought "damages in the amount of $1,000,000," plus pre-judgment interest from the Defendants. The award, as modified, does not exceed that amount. Because the Defendants had sufficient notice of the amount of the claim, see Flax v. DaimlerChrysler Corp., 272 S.W.3d 521, 548 n.1 (Tenn. 2008) (Wade, J., concurring) (noting that "the purpose of a complaint is to provide notice of a claim"), the Defendants are not entitled to relief.

## Conclusion

A cause of action for failure to procure an insurance policy may arise when a policy is contestable due to the wrongful conduct or omission of the agent. Notwithstanding the Morrisons' failure to read their insurance applications, the acts of the Defendants, as determined by the trial court, gave rise to a claim for failure to procure. The judgment for damages against the Defendants for failing to procure an enforceable life insurance policy is not offset by the settlement with American General and is not in conflict with the ad damnum clause in the complaint. Finally, the evidence preponderates against the trial court's holding that the Defendants' actions constituted negligence, negligent misrepresentation, breach of fiduciary duty and violations of the Tennessee Consumer Protection Act; thus, the Plaintiff is not entitled to attorney's fees or pre-judgment interest as to this claim. The Court of Appeals is reversed in part and affirmed in part, and the case is remanded to the trial court for determination of post-trial interest. Costs of the appeal shall be taxed one-half to the Plaintiff and one-half to the Defendants.

_____
GARY R. WADE, JUSTICE

---

[16] The Plaintiff's complaint explicitly sought the following: "[t]hat the [P]laintiff be awarded damages in the amount of $1,000,000"; "[t]hat the [P]laintiff receiv[e] treble damages and attorneys' fees under the [TCPA]"; and "[t]hat the [P]laintiff be awarded prejudgment interest."