FILED
11/20/2019
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 15, 2019 Session

**RUBY DIANE BARRON v. BRUCE JOSEPH BARRON**

**Appeal from the Chancery Court for Hamilton County**
**No. 17-0585          Pamela Fleenor, Judge**
_____

**No. E2018-02257-COA-R3-CV**
_____

Wife filed for divorce on the grounds of irreconcilable differences. The trial court granted husband a divorce on the grounds of wife's adultery and other inappropriate marital conduct. Despite the many factors found by the trial court to be favorable to husband, the court awarded husband only 43% of the net marital estate. It also awarded husband one year of transitional alimony at $2,000 per month. We hold that the trial court erred in its division of the net marital assets and in its determination as to the duration of the transitional alimony awarded to husband. We modify the trial court's judgment so as to provide husband five years of transitional alimony. We hold that the Roth IRA is a marital asset; it is awarded to husband and wife in equal share. Furthermore, we hold that the FERS pension account is to be divided between the parties as set forth in this opinion. As modified, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Modified in Part; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J. and THOMAS R. FRIERSON, II, J., joined.

Jillyn O'Shaughnessy, Chattanooga, Tennessee, for the appellant, Bruce Joseph Barron.

John T. Rice, Chattanooga, Tennessee, for the appellee, Ruby Diane Barron.

**OPINION**

**I.**

In July 1991, husband and wife met, in Germany. At the time, husband worked as a tour guide, and wife worked as a speech pathologist on a US military base. In

-1-

December 1991, they were married; Husband was 36 years old and wife was 40. It was both of their first marriage.

The parties live in Germany. Husband is now 62 years old and wife is 67. Husband has a plural effusion of the left lung from cancer. He had chemotherapy from 2015-2016, and hernia surgery in 2018. As a result, husband can only work a job that is sedentary. Wife is in good health, and continues to work as a speech therapist for the U.S. Department of Defense school system, in Germany. Her income is listed as $11,893.52 per month.

The parties have a biological son that was born in 1993. They later adopted a second son that had developmental delays. After the adoption of their second child, husband became a homemaker. Husband has not been employed outside of the home since 2005. Throughout the marriage, wife traveled extensively without the children and husband. Husband was often left home alone to care for them.

On August 8, 2017, wife filed a complaint for absolute divorce on the ground of irreconcilable differences. On November 21, 2017, husband filed his answer and counterclaim; he alleged that wife had committed adultery and other inappropriate marital conduct. Husband stated in his response to wife's request for interrogatories that:

> My wife is rarely at home on US holidays or school vacation time. She has regularly taken overnight trips and extensive vacations without our family. This has been going on for many years. US holidays and school vacation times were normally the busy times when I would've worked as a tour and travel guide for the US forces in Europe. I was unable to work when she was gone because we had a young child to care for. This was starting [sic] when my wife went on a trip to Russia by herself in April Easter break of 1995.
>
> My wife was also president of the overseas speech and hearing association which required her to travel on frequent overnight trips, sometimes from Germany back to the US. Some of the more recent trips she has taken, while I was with the kids at home, are as follows:
>
>> Oct 6-9 2017. Milan Italy
>> Sept 15-17 Somewhere in Germany
>> Sept 1-4 Belgium
>> July 6-Aug 12 Florida, Tn. (Against my will,
>> She took my youngest son went with her.)
>> May 26-29 Mediterranean island of Cypress

April 7-16 Greek island cruise
Nov 23-27 2016 Thanksgiving Barcelona, Spain
Oct 7-10 Stockholm, Sweden
Sept 2-5 Vienna Austria
July and Aug tour of China
April 7-9 Croatia Slovenia
Fall of 2015 Eastern Mediterranean cruise
June-Aug Florida, Ms
April Baltic states Latvia, Lithuania, Estonia
2014 June-August Cambodia, China and S Korea

This is only a partial list, there are many more vacations she has taken without our family. Diane has had extramarital relationships which are not appropriate or conducive to married family life. She continues to this day to be in a casual relationship with a man whom she met on the internet, going on dates with him to plays in Frankfurt, taking him shopping in the military PX, which is illegal because it is a violation on German tax laws. She puts her job and our family in jeopardy by doing this. It's embarrassing and humiliating to me because my neighbors have informed that this man was in our house when I wasn't there. She continually had him at our house when I wasn't home. I know this because my kids always told me about it. I believe it hurt them emotionally.

I initiated marital counseling several years ago. The counselor told Diane she should stop seeing this man but Diane refused and quit counseling instead.

She also continues in an inappropriate relationship with an old boyfriend who used to write her letters of affection and address them to Diane's friend so that I wouldn't find them in our mailbox. This goes back to the days before email. She saved the letters and I discovered them when unpacking a move from Darmstadt to Wiesbaden Germany for her job. The messages were left open on our family computer indicating that they regularly planned on meeting each other. He regularly traveled from Atlanta to Germany on duty assignment with the US army. He was with my wife on the third weekend in February, 1997 while I was working on a tour at the time. I know this because he said it in the letter. He

also said how affectionate and sexy she was. Diane continues to correspond back with him to this day. I didn't feel too good about it. It had become apparent to me that Diane cared more about the affection of other men than her husband.

My wife is moody, changing her mind frequently. This is the third time divorce has been filed. The other two were withdrawn. One was in Germany and was withdrawn because she did not want to divide assets. The other in Tennessee because attorney was someone she told me that she previously had sexual relations with and that she continues to visit and be friends with today. My wife insisted on having invitro-fertilization done by a fertility specialist until she was 49 years old, even though the doctor told her that infertility was not her problem, advanced age was. This included having 2 egg donors which is not legal in Germany. We had to go to Belgium for this. This was at an expense of more than $60,000. She finally agreed that adoption was the best option. We were only allowed to adopt because I was younger than 50 at the time and told the judge and stated in our dossier that I would be able to stay at home and care for the baby while she had a professional job that would provide a good income for our family. This worked well for our family but because the nature of my work, being out of the country for days at a time, I was no longer able to work this job. When my youngest son was old enough for school, I worked at the education center on the military base but lost this job when the base closed and Diane transferred and moved our family to Wiesbaden for her new job. We purchased a house together which my name was on the loan and has been paid for with the US government employee overseas dependent spouse and family housing allowance. My name was on the mortgage because otherwise, the bank would not finance it. Shortly after we moved into the new house, Diane closed joint accounts and credit card and withheld money even though she was getting a tax free spouse and family housing and overseas cost of living allowance. On a Facebook post, she told her boyfriend in Pell City Al that she intended on doing this. This has continued to this day, she refuses any support. This includes medical and dental care because I did not have the money to pay up front. When I was diagnosed with cancer and a grade 4 tumor requiring surgery and several months of chemo therapy, my wife left for a vacation in Florida for the

summer leaving me no money for the chemotherapy medication. This was even though we had insurance that would reimburse 90% of the cost. I had to [borrow] money. She has continued to tell me to move even though I am unable to and this has put tremendous stress on me. Legally, I can only stay in Germany with my son as a dependent spouse on US government orders which I have been for over 25 years. My wife has refused intimacy for a long time telling me that she is intimate with someone better able to please her. I believe she says this to me only to be hurtful. This is only a partial description of behaviors which to me are inconsistent with a healthy marriage.

On December 13, 2017, wife filed an affidavit stating that the oldest son had graduated from the University of Tennessee. The youngest son graduated from high school, in Germany, in 2018, and has been accepted under the Tennessee Promise Program, which grants students free college tuition. Therefore, both children have reached the age of majority.

On May 3, 2018, wife filed a motion to set the matter for trial. On May 24, 2018, the trial court entered an order stating that the parties had agreed to set the trial for August 8, 2018 as to all issues. Wife then filed for partial summary judgment; she requested that the parties' home (referred to as Hessloch Folio 813, in Wiesbaden, Germany) be deemed her separate property. Wife argued that she paid the mortgage, upkeep, and other expenses for the home, and therefore it should be her separate property. She argued that husband has made "no contribution whatsoever to the property."

Husband opposed wife's motion for partial summary judgment. He argued that the house was acquired, on July 8, 2010, while the parties were married. He argued that

Tennessee law distinguishing marital property from separate property is clear. [Tenn. Code Ann.] § 36-4-121(b)(1)(A) describes "marital property" as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce…"

He argued that the house does not qualify as separate property. He argued that, in addition to non-monetary contributions recognized under law, wife produced documents that contained financial statements regarding the home dated in 2010 addressed to

husband alone, and a loan statement in both husband and wife's names. In addition, husband argued that

> As for [wife's] claim that she is the only one who has contributed to the Home, the fact is also disputed. Contributions to the marital property is a factor that the Court may consider in dividing the marital asset, but not in determining whether the asset is a separate asset when he does not meet the very definition of separate property, such as the Home in this case.
>
> Tennessee recognizes that a spouse's contributions to marital property are not limited to financial contributions. [Tenn. Code Ann.] § 36-4-121(b)(1)(D) states that a "substantial contribution" by a spouse to marital property may include "the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine." Thus, even if [wife] paid the mortgage on the Home, [wife] was not the sole contributor to the Home and is not entitled to separate property rights to the Home at the exclusion of the [husband].

The court denied wife's motion. It held that wife failed to allege any facts demonstrating that the home should be considered separate property. The court further stated that even if the burden of production had shifted to husband, he presented a genuine issue of material fact as to whether the home should be considered separate or marital property. The court noted that husband had alleged he contributed financially to the home by taking out a loan of 285,000 Euros for the purchase, and other substantial contributions as a homemaker, parent, and otherwise. The court held that husband "presented evidence from which the factfinder could determine that [husband] 'substantially contributed' to the home, within the meaning of Tennessee law, and therefore, there is a genuine issue of material fact in dispute."

At the outset of the trial, the trial court asked if there were any preliminary motions or announcements. Wife's counsel stated "no." Both parties waived making an opening statement.

Husband and wife were the only witnesses that testified at trial; the court took the matter under advisement. On September 28, 2018, the court entered its memorandum opinion and decree. The court held that husband was the credible witness. The court held that, when the parties moved into their house in Wiesbaden, wife took the master

bedroom and husband had to purchase a separate bed and sleep in the basement. Wife locked the master bedroom door beginning in January 2018.

The court held that wife committed adultery, made disparaging remarks toward husband, and did not help him with his cancer treatment. Accordingly, the court granted husband a divorce on the grounds of wife's adultery and inappropriate martial conduct.

The court held that wife has the greater ability for future acquisition of capital assets and income. It held that wife had dissipated marital assets. After the divorce was filed, wife withdrew $9,500, on September 21, 2017; $9,800, on September 22, 2017; $5,000, on September 25, 2017; and $8,600, on September 26, 2017 – for a total of $32,900 – from her account at Community Bank. The court held that the parties had a joint mutual fund at Smith Barney to which both contributed; wife made numerous withdrawals of $3,000 to $5,000 each from the account and closed it in 2015. In addition, $4,600 is missing from the house; the court stated that "[t]his was next to the son's passport. Wife admitted taking the son's passport but denied taking the money. The [c]ourt finds it is more likely than not that [w]ife took this money." The court also stated that husband found $12,000 in the master bedroom with two withdrawal tickets dated October 19, 2017 and October 24, 2017 (both after the divorce was filed).

The court held that wife receives a housing allowance each month. The utilities and insurance are covered by the housing allowance. Wife makes $88,000 a year and receives $54,890 in housing allowance that is not taxable. She also receives $500 a month in cost-of-living-adjustment that is tax-free. She receives two paychecks a month, one for $4,638.77 and one for $4,245.25. The court stated that wife based her request for the vast majority of marital assets on the fact that she "paid for everything." Wife had further argued that "[h]usband was underemployed or chose not to work, and therefore did not contribute to the marriage or the marital estate." The court disagreed. The court emphasized husband's contributions to the household as a homemaker, while wife worked, throughout its decree. It held that "[w]ife contributed to the marriage financially and [h]usband contributed as house husband. Husband's contributions as homemaker contributed to the increased earning power of [w]ife."

The court stated that it will be difficult for husband to find employment in Germany, once the divorce is entered, due to an established hierarchy for obtaining US government employment overseas. Because husband will not be able to obtain employment in Germany, as he will no longer be a spouse of a government employee, he can only remain for three months following the divorce. Husband will need to make an intercontinental move to re-establish himself in the United States.

Ultimately, the court divided the marital assets, as follows:

## EQUITABLE DIVISION OF ASSETS AND LIABILITIES

### HUSBAND

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Thrift Savings | $460,000 | Starr card | $800 |
| Community National Account #3681602167 | $65,000 | Medical bill | $4,600 |
| Naspa Bank | $20,000 | Andrews FCU Visa | $1,000 |
| Andrews FCU | $10,300 | | |
| NET | $548,900 | | |

### WIFE

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Marital residence | $720,000 | Mortgage | $319,000 |
| Timber Land | $79,000 | Loan | $20,000 |
| Andrews FCU | $49,000 | | |
| Naspa Sparkasse | $30,000 | | |
| ROTH IRA | $139,000 | | |
| Cash removed by Wife | $49,500  (32,900 + 12,000 + 4,600) | | |
| 2004 Volvo | $3,000 | | |
| NET | $730,500 | | |

The net marital assets total $1,279,400. Husband's award of $548,900 represents approximately 43% of the total assets. Wife's award of $730,500 represents approximately 57% of the total assets. The court awarded each party its Lincoln Life Insurance policy. The court stated that "[it] is aware that the property division is not equal, but the [c]ourt determines that it is an equitable division, and the difference is a factor in the alimony award…and in the award of attorney's fees." The court did not clearly elucidate how its award was equitable in light of its factual findings.

The court awarded husband transitional alimony of $2,000 per month for one year, and directed wife to maintain husband's health insurance until he reaches the age of 65. The court stated that the alimony was awarded so that husband can "come to America to establish and maintain a household and to adjust to the economic consequences of the divorce." The court declined to grant a longer period of alimony, because "[w]ife is 67 years old and has already passed retirement age."

The court also held that wife paid her attorney's fees with marital assets. "The [c]ourt's division of assets provided [h]usband with some funds but those assets are to provide long-term security." Accordingly, the court awarded attorney's fees as alimony *in solido* to husband; the court's division of assets resulted in wife receiving $181,600 more, and the court stated that the $24,000 in alimony *in solido* "can be used to adjust the distribution of marital assets."

On October 16, 2018, husband filed a motion to alter or amend requesting one half of the FERS Pension Account, a longer period of alimony, and a more equitable share of the marital assets and liabilities. On October 23, 2018, wife filed a motion to alter or amend or make additional fact findings with a brief in support. Wife argued that the court had improperly prevented her from conducting necessary discovery. She argued that the court should have given her credit for having insurance for husband through her job, instead of holding that she failed to help husband with his cancer treatment. Furthermore, she again argued that husband is not disadvantaged, and that she is entitled to the accrued marital assets, because she was the primary wage earner. Both wife and husband filed responses.

On November 6, 2018, the court entered an order clarifying that wife should receive $730,500 of net assets in addition to her FERS retirement. In addition, the court entered two orders denying the motions to alter or amend. Essentially, the court held that the parties were attempting to relitigate matters that had already been adjudicated, and that the division of assets must be equitable, but not necessarily equal.

On October 16, 2018, husband had filed an affidavit of attorney's fees showing fees and expenses totaling $18,243. On November 7, 2018, husband filed a motion requesting that wife pay his attorney's fees. The court awarded husband his attorney's fees by order dated November 20, 2018, in the amount of $18,243. On December 20, 2018, husband timely appealed.

## II.

Husband asks this Court to consider:

> Whether the trial court erred in distributing the marital assets
> and liabilities of the parties.

Whether the trial court erred by awarding only one year of transitional alimony.

Whether husband should be awarded his attorney's fees on appeal.

Wife asks this Court to consider:

Whether the trial court erred by failing to require supplemental discovery.

Whether the trial court erred in finding that wife committed adultery and inappropriate marital conduct.

## III.

We review a non-jury case *de novo* upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000). We review questions of law, including those of statutory construction, *de novo* with no presumption of correctness. ***Bowden***, 27 S.W.3d at 916 (citing ***Myint v. Allstate Ins. Co.***, 970 S.W.2d 920, 924 (Tenn. 1998)); *see also* ***In re Estate of Haskins***, 224 S.W.3d 675, 678 (Tenn. Ct. App. 2006). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See* ***Morrison v. Allen***, 338 S.W.3d 417, 426 (Tenn. 2011).

## IV.

As a preliminary matter, wife argues that the trial court erred by failing to require supplemental discovery. She argues that this hindered her ability to adequately prepare for trial. The record indicates that, on May 3, 2018, wife filed a motion to set the matter for trial. On May 24, 2018, the trial court entered an order stating that the parties had agreed to set the trial for August 8, 2018 as to all issues. At trial, when asked by the court, wife stated that there were no preliminary matters to be considered by the court. Wife raised the discovery issue to the trial court in her motion to alter or amend. The court held that

> [a]dditionally as grounds Plaintiff seeks to raise a discovery issue which the Court determines is also improper for a motion filed pursuant to Rules 52 and 59. Further Plaintiff inaccurately asserts this Court "sustained Defendant's Motion

-10-

to Quash a subpoena for Defendant's testimony." However, this Court did NOT quash the Defendant's deposition subpoena. Rather the Court, by Order entered March 28, 2018, merely ruled that Defendant did not have to produce "certain documents" *at his deposition*. Additionally, the Court notes that on May 3, 2018, Plaintiff was the party that moved to set the case for trial. Further, the case was set by Order entered May 29, 2018 by agreement of the Parties. Plaintiff never filed a motion to continue in order to depose Defendant. If Plaintiff failed to depose Defendant, that was her choice.

Accordingly the Plaintiff's motion to alter or amend the Final Decree entered September 28, 2018 is DENIED in its entirety.

(Emphasis in original).

Based on the foregoing, the record does not indicate that wife's ability to prepare for trial was hindered due to a "lack of reasonable discovery." Instead, it indicates that wife chose to set this matter for trial, and later consented to the trial date. The decision to proceed to trial with the information then obtained was wife's prerogative. Accordingly, we hold that the trial court did not err in its holding on this issue.

## V.

### A.

On appeal, wife argues that husband failed to sufficiently specify wife's adulterous and inappropriate marital conduct sufficient to grant the divorce on these grounds. We disagree. The trial court heard extensive testimony on this issue, and found husband to be the credible witness. As noted elsewhere in this opinion, the trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011). Husband testified that:

> Q:   Have there been times when you did not seek medical care because you didn't have the money upfront?
>
> A:   Very regretfully, yes.
>
> Q:   Did you go to your wife to request it?

A:   Yes.

Q:   What was her response?

A:   You come up with the deductible. That's your problem.

Q:   How recently was that?

A:   As recently as the past month, but I've heard it often over the last ten years.

*        *        *

Q:   What is her treatment of you?

A:   Disrespectful at best.

Q:   How does she treat you in front of other couples?

A:   She humiliates me.

Q:   Give the Court an example of how she has done that.

A:   There are many examples. Years ago when we were visiting friends and family and the friends would ask how is your German coming along; I said, not bad, it's pretty good. She said, he never understands anything. He can't translate anything. He doesn't know it that well. It's little putdowns like that. We were invited to my neighbor's house for a New Year's Eve dinner. In Germany New Year's is almost like Thanksgiving. They say, what do you wish for in the new year, Diane? She would say, for a rich German man. Everyone laughs it off, but it's kind of hurtful and disrespectful. She says it in front of me. There have been other times as well.

*        *        *

Q:   Okay. Well, can you think of any other specific examples of things that Mrs. Barron would say to you in front of your children?

A:   Mostly demeaning things that degrade my character or worth in the household.

Q:   I'm trying to ask for the words she used. If there's any profanities, you spell it or you just say the first letter, whatever the Court -- the first letter is sufficient.

A:   It's difficult to say. Well, when I inquired about marital intimacy or our life in the bedroom, she said she did not want to have relations with me. She said you have no D-I-C-K. I'm F'g someone with a D-I-C-K. You have no D-I-C-K. That was one I remember that was quite hurtful.

Q:   When did you go through chemotherapy treatment?

A:   In 2015 and 2016.

Q:   Tell the Court Mrs. Barron's involvement in that treatment and your recovery.

A:   Well, there was almost no involvement. She did go with me to the pharmacy one day and use the credit card to pick up the drugs. That was at -- after the cancer surgery, I was in -- it was complicated, so I was in the hospital for three weeks. We had to meet with the oncologist, and they asked that a family member be there to discuss the treatment, to have someone with you, and we waited for over an hour. She said she would come, but she didn't come because she was angry with me for some reason, so I went back the next day and just did it on my own.

Then she took a vacation that summer, and she left. I didn't have access to a credit card or money at that time to acquire the medication necessary. So I asked my son for the credit card that he had access to, and I

was able to get the medication with that, Xeloda it was called.

Q:  Is this before or after you had the proceeds from the Darmstadt house?

A:  It was before. That would have been in July of -- no. I'm sorry -- yes, July of '15.

\*     \*     \*

Q:  Did you ask Mrs. Barron for financial assistance for your medical needs?

A:  Yes, I did.

Q:  What was her response?

A:  No, she's leaving on vacation. She left and took my youngest son with her on that trip.

Husband testified regarding wife's insensitivity to his emotional and health needs, to how she lacked an interest in his wellbeing, and how she regularly engaged in demeaning speech. In his testimony at trial, husband specified instances of wife's adulterous, aloof, and demeaning conduct, which the trial court found to be credible. The record indicates that wife shut husband out of her life to the extent that she put a literal lock on her bedroom door. Wife did not address the issue of adultery at trial.

The trial judge saw the witnesses and heard them testify, and had the opportunity, denied to this Court, of observing their manner and demeanor while testifying. As this Court has stated, "the finding of the [trial judge] is entitled to great weight when [she] saw the witnesses face to face and heard them testify [] and this is peculiarly true where [] the determination of the issues of fact depends, in large measure, upon the comparative credibility of the two adversary parties to the suit." *See **Troutt v. Troutt***, 35 Tenn. App. 617, 626, 250 S.W.2d 372, 376 (1952) (holding that the offense of adultery may be proved by circumstances from which guilt may be reasonably inferred); *see also **Canning v. Canning***, 59 Tenn. App. 678, 685, 443 S.W.2d 502, 505 (1968) (holding that adultery can be proven by circumstantial evidence; it is not necessary to have direct evidence of the illicit intercourse). We hold that the evidence does not preponderate against the trial court's findings as to the grounds for divorce. We affirm the granting of a divorce on the grounds of wife's adultery and wife's inappropriate marital conduct.

**B.**

"Trial courts have broad discretion to determine whether spousal support is needed and, if so, the appropriate type of alimony, amount, and duration." ***Neamtu v. Neamtu,*** 2009 WL 152540, at *5 (Tenn. Ct. App. Jan. 21, 2009) (citing ***Wynns v. Wynns,*** 2008 WL 4415786, at *2 (Tenn. Ct. App. Sept. 26, 2008)). Appellate courts are, therefore, reluctant to second guess a trial court's decision regarding alimony "unless it is not supported by the evidence or is contrary to the public policy embodied in the applicable statutes." ***Brown v. Brown,*** 913 S.W.2d 163, 169 (Tenn. Ct. App. 1994) (citations omitted). Tenn. Code Ann. § 36-5-121(g)(1) states that

> Transitional alimony means a sum of money payable by one (1) party to, or on behalf of, the other party for a determinate period of time. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection.

Tenn. Code Ann. § 36-5-121(g)(1).

In addressing whether or not to award alimony, the trial court considered the factors enumerated in Tenn. Code Ann. § 36-5-121(i). The court determined that wife has the greater earning capacity. She makes $88,000 a year in addition to her housing and cost of living allowances. Husband has not been employed since 2005, and instead has functioned as a homemaker. Husband has recently gone through chemotherapy and undergone a hernia surgery; at best, he can only work a sedentary job. Wife instead enjoys good health. In addition, the trial court stated that "it is appropriate to attribute fault and [to hold] that [w]ife caused the demise of the marriage." Ultimately, the court held that "[h]usband is the disadvantaged spouse and that [w]ife has the ability to pay alimony."

It is important to reiterate that the trial court held it will be difficult for husband to find employment in Germany, once the divorce is entered, due to an established hierarchy for obtaining US government employment overseas. Because husband will not be able to obtain employment in Germany, and will no longer be a spouse of a government employee, he will lose his residency status and will only be able to remain in Germany for three months following the divorce. Therefore, the record indicates that husband is going to have to make an intercontinental move in order to re-establish himself in the United States following the divorce. Accordingly, the court stated that husband will need financial support in order to "come to America to establish and maintain a household and

to adjust to the economic consequences of the divorce.[] The [c]ourt is aware that it may take some time before the Thrift Savings Fund can be transferred to [h]usband."

Despite the foregoing, the court only awarded husband one year of transitional alimony at $2,000 per month. The court's conclusion as to the duration of transitional alimony necessary for husband, the economically disadvantaged spouse, to adjust to the economic consequences of divorce does not comport with its factual findings. The evidence preponderates in favor of husband needing a longer duration of transitional alimony. Therefore, we hold that the trial court erred by awarding husband only one year of transitional alimony. We hold that the duration of the trial court's award is insufficient and will result in an injustice to husband. Accordingly, we modify the trial court's holding in order to extend the duration of transitional alimony; we hold that wife is to pay husband $2,000 per month in transitional alimony for a period of five years. In order to ensure clarity, we do not disturb the trial court's holding that wife is to also maintain husband's health insurance until he reaches the age of 65.

## C.

On appeal, husband argues that the trial court erred by awarding a larger portion of the net marital assets to wife. He argues that, if anything, the court's factual findings support a larger award to husband than to wife. Husband argues that the trial court's rationale that the division was ultimately equitable, based upon the alimony and attorney's fees awards to husband, was error:

> The trial court erred in its legal reasoning for providing [w]ife more of the assets. There is no law to support that the trial court may use the alimony award or award of attorney's fees as alimony as a reason for the disparate division of assets and liabilities to one party. Even if the trial court could consider those items, a total award of $24,000 in alimony and less than $20,000 of alimony *in solido* for attorney's fees does not even provide [h]usband an equal amount of marital assets, much less an equitable amount of marital assets. As such the trial court's legal reasoning is a 'misapplication of statutory requirements and procedures' as described in *Herrera*, and the division should be amended to provide [h]usband one-half of the FERS Pension Account.

We agree with the trial court that the distribution must be equitable, but not necessarily equal. However, in the present matter, the trial court did not clearly elucidate why it believes that its legal conclusions as to the distribution of the net marital assets was equitable in light of its factual findings. We believe that it was not.

In making equitable division of marital property, Tenn. Code Ann. § 36-4-121(c) instructs that the court shall consider all relevant factors, including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) (A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

 (B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10)    In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence;

(11)    The amount of social security benefits available to each spouse; and

(12)    Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c).

When considering the above factors, the trial court held that the parties had been married for twenty-six years at the time of the complaint for divorce. Both parties are in their sixties. Husband has serious and potentially critical health issues; wife enjoys good health. Husband is only able to work a sedentary job, and it is highly unlikely that he will be able to remain in Germany following the divorce, and even less likely that he will be able to find a job. Wife's residency in Germany is stable, due to her present employment. Her present employment provides her with a sizeable income and a housing allowance that covers her utilities and insurance. Husband has a bachelor's degree; however, he has not worked since 2005. Wife has maintained employment throughout the marriage; the trial court determined that husband's status as a homemaker substantially contributed to the marriage, and allowed wife to increase her earning capacity. The court determined that both parties had contributed to the acquisition of marital property and development of the household; wife's contributions were primarily financial, while husband's was primarily, but not exclusively, in his capacity as a homemaker. Tennessee law specifically recognizes that substantial contribution to a household can be made in the capacity of a homemaker. *See* Tenn. Code Ann. § 36-4-121(b)(1)(D) (stating that "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as a homemaker). In addition, the court held that wife had dissipated some of the marital assets. The trial court explicitly held that "[h]usband has the greater financial need." The court also held that "[w]ife has the greater ability for future acquisition of capital assets and income as she is still employed."

In light of the foregoing findings of fact made by the trial court, we hold that the evidence preponderates against the court's conclusion to award wife a greater share of the

marital assets. The court's conclusion to award husband only 43% of the marital assets and wife 57% was in error and not equitable. Accordingly, we modify the division of net marital assets such that the Roth IRA is split 50/50 between husband and wife. The record indicates that the Roth IRA was accumulated during the marriage and is therefore marital property and a proper subject of division. The addition of 50% of the Roth IRA to husband's net marital assets increases his net marital assets awarded to 48.3% at $618,000; it renders wife's awarded net marital assets 51.7% of the net marital assets at $661,000.

In addition, the trial court held that the FERS pension account is a marital asset; it awarded wife 100% of the account. The court stated that the pension would amount to retirement benefits "of approximately $2,000 a month." The pension was awarded to wife in addition to her portion of the net marital assets.

The trial court failed to elucidate why this award to wife was equitable in light of its factual findings. Husband argues that the decision to award the entirety of the FERS pension account to wife was in error. He argues that this award of approximately $2,000 a month to wife resulted in a windfall in her favor, and that, when factored into the total awarded assets, substantially alters the percentage distribution in favor of wife and is not equitable.

We agree with husband that the decision to award wife 100% of the FERS pension account was not equitable in light of the factual findings. In order to ensure that the division of the net marital assets remains equitable, we hold that the FERS pension is to be divided in proportion to this Court's decision as to the division of the other net marital assets. Accordingly, we hold that husband is to receive 48.3% of the FERS pension payout once the pension payout commences; wife is to receive 51.7% of the FERS pension payout once the pension payout commences.

**D.**

Husband requests this Court award him his attorney's fees on appeal. This Court stated, in ***Koja v. Koja***, that

> As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the relevant factors enumerated in [Tenn. Code Ann.] § 36–5–101(d). A spouse with adequate property and income is not entitled to an award of alimony to pay attorney's fees and expenses. Where a spouse has property and income adequate for her needs, it may not be proper for the trial court to make an additional award of alimony in solido for payment of the wife's attorney's fees. "These

awards are appropriate, however, only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses," or would be required to "deplete his or her resources in order to pay these expenses." Where one party has been awarded additional funds for maintenance and support and such funds are intended to provide the party with a source of future income, the party need not be required to pay legal expenses by using assets that will provide for future income.

*Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000) (internal citations omitted). It is clear that husband would be required to deplete his awarded resources in order to pay his attorney's fees on appeal. Additionally, as stated *infra*, wife has been paying her attorney's fees with marital assets. Therefore, we hold that this is a proper instance in which to order wife to pay husband's reasonable attorney's fees and costs incurred on appeal, in addition to the attorney's fees awarded by the trial court, as alimony *in solido*. This matter is remanded to the trial court for the sole issue of setting the amount of husband's attorney's fees accrued on appeal.

## V.

Lastly, husband filed an execution of garnishment. Wife filed a motion for stay of execution, or to quash the garnishment. In response, husband filed a motion stating that wife has failed to pay any alimony, as ordered; has paid no attorney's fees, as ordered; has failed to transfer the $65,000 in the form of the Community Nation Account, as ordered; and has failed to transfer the Thrift Savings Account, as ordered. In addition, husband stated that wife has instead used the divorce as "a weapon" and has advised the government that husband is no longer married to her; this had the effect of revoking his status as a dependent, preventing him from using the commissary, and has placed his status in Germany in jeopardy. On June 3, 2019, the trial court entered an order staying the execution of the garnishment. On appeal, husband asks that we remove this impediment. Given husband's precarious situation, and seeing no reason for further delay, we vacate the trial court's order staying execution of the garnishment.

## VI.

The judgment of the trial court is modified, and, as such, is affirmed. Costs on appeal are taxed to the appellee, Ruby Diane Barron. This matter is remanded to the trial court to set the amount of attorney's fees accrued on appeal and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE