IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 16, 2025 Session

## ANGELA LYDTIN, ET AL. v. ADAM BLAKE CARRINGER

**Appeal from the Chancery Court for Bradley County**
**No. 24-CV-320      Jerri S. Bryant, Chancellor**

_____

**No. E2025-00064-COA-R3-CV**

_____

This appeal concerns the trial court's dismissal of a petition for an order of protection filed by the appellant mother against the appellee father. We affirm the trial court's dismissal of the order of protection.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which ANDY D. BENNETT and KRISTI M. DAVIS, JJ., joined.

Mark Randall Sellers, Cleveland, Tennessee, for the appellants, Angela Lydtin and S.C., a minor child.

Adam Blake Carringer, Cleveland, Tennessee, pro se Appellee.

## OPINION

### I.      BACKGROUND

The post-divorce and parenting plan issues between the appellant, Angela Lydtin ("Mother"), and the appellee, Adam Blake Carringer ("Father"), have caused years of acrimony between them. S.C. ("child") was born of Mother's and Father's marriage. In the past, they all lived together.

On Monday, November 18, 2024, Mother emailed Father to request that he exchange parenting time with her for the upcoming weekend. Mother explained that her sister's family would be in town from Friday, November 22, until Friday, November 29, for Thanksgiving and that the child was excited to see her cousins on that side of the family.

Mother stated that the child does not have too many opportunities to be with her side of the family. Father declined to modify the parenting schedule, explaining that the family already had "lots of plans" for that weekend, including the child's stepsister's birthday celebration, and that it was "a very busy time of year for [them]."

On December 5, 2024, Mother petitioned the trial court on behalf of herself and the child to enter an order of protection against Father. The child was then twelve years old. Mother alleged "emotional and physical abuse" as the basis for the requested order. Among other things, Mother alleged that the child's behavior worsens whenever she spends time with Father; that he insults, yells, shakes, pushes, and drags the child; that the child is constantly fearful around Father; and that Father threatens and yells at Mother at school events and when they exchange the child for parenting time. Mother further alleged that, on an unspecified date, Father challenged the child to stab his wife ("Stepmother") with a knife. The trial court entered a temporary order of protection the same day. It was extended to December 17, 2024.

The case proceeded to a December 17 hearing at which several witnesses testified. The child was then thirteen years old. Father proceeded pro se. Department of Children's Services case manager Melissa Brown recalled that she received two referrals of psychological harm and physical abuse of the child. Father was the alleged perpetrator. On December 4, 2024, Ms. Brown met with the child, Mother, Father, Stepmother, and Mother's husband ("Stepfather"). All of them signed a non-custodial family permanency plan which included the following action steps: Father and Stepmother to attend anger management classes; Father and Mother to undergo mental health assessments and follow all recommendations; Father, Stepmother, Mother, and Stepfather to ensure that the child receives a mental health assessment and counseling services to be held at school and that she follows all recommendations; and Mother and Stepfather to participate in a parenting class. Ms. Brown testified that the child was "really upset" during the meeting, particularly upon Father's arrival. She recalled the child's reporting of the knife incident as follows:

> [The child] would not give [Stepmother] her telephone number from her cell phone. And so [Father] was trying to make an example of how bad that hurt [Stepmother] that she wouldn't give her that cell phone number. So he took a knife and gave [the child] the knife, and told her to stab his wife as an illustration. And [the child] said, I am not going to stab her. She didn't really understand what was going on and why he was even doing that.

On cross examination, Ms. Brown agreed that the child admitted Stepmother has never spanked her and affirmed that she was not concerned about physical abuse. Rather, Ms. Brown expressed concern about the child's mental wellbeing.

Next, the child's seventh grade science teacher testified. She recalled that on the afternoon of Friday November 22, 2024, she and other educators comforted the child when

she was experiencing a panic attack around the time of school pick up. It was Father's scheduled day to retrieve the child from school ahead of weekend visitation. The child related to the science teacher that Father hits her, is mean to her, and takes away her Apple watch until it is time for school. The teacher recalled that when the child initially refused to go home with Father, he stated that she was acting out because Mother "didn't get her way." The teacher related that Father's demeanor that day was polite, not very friendly, but not angry. She remembered that Father encouraged the child to bring her mobile phone to his home.

Next, the child's middle school counselor testified about an October 31 meeting with the child wherein the child recounted the knife incident, disclosed that child protective services was already involved with her family, and tearfully stated that she is nervous and miserable while at Father's and Stepmother's home. The school counselor met with the child again on November 19 and November 21. During those meetings, the child "described her dad [and] something about they were taking a video and [he] was like pinching her arm and like forcing her to say bad things about [Mother]." The child also told the counselor that one time Father became angry and hit her because she had not shaved her legs. The counselor reported the child's statements to child protective services following the November 19 meeting. The child lied to Father about exactly when she began speaking to the school counselor about family problems. When questioned about the November 22 school pick up, the counselor recalled that the child was panicked and crying because she did not want to go home with Father. It was a two-hour incident involving several educators and the school resource deputy. The counselor privately advised the child to email her using her Chromebook if she felt she was in danger while with Father.

Next, the school resource deputy described the November 22 incident. He did not recall that the child had ever before refused to go home with Father. He affirmed that Father was calm but perplexed when the child refused to go home with him that day and that Father asked for his help in trying to deescalate the situation. The school resource deputy remembered that the child was crying, shaking, and very upset that afternoon. He testified that Father did not threaten the child or look at her in a cross manner.

Mother testified next. She affirmed that the knife incident was in August 2024 and that she never spoke with Father about it. She testified that there were two disagreements about the child's soccer paperwork in 2023 and 2024. In July 2024, after preparing the paperwork, Father approached Mother on the soccer pitch and yelled, "we don't need your paperwork," while standing so close to her that he was spitting on her as he yelled. Mother took this as a form of intimidation. Mother generally complained about conduct at the child's soccer games, such as when Father insists on speaking to the child even when it is during Mother's parenting time. Mother recalled a soccer match on an unspecified date at which Father yelled loudly that he had a right to see the child.

Next, the child testified in open court. The trial court conducted most of the questioning. She testified that Father hit her once during the past six months for not shaving her legs. When asked about the August 2024 knife incident, the child stated that Father angrily handed her the knife and she believed he was serious when he said to stab Stepmother. When questioned about November 22, the child related that she "started to get scared" when Father arrived because she thought maybe he knew she had been speaking with the school counselor. The child agreed that she was attempting to skip that particular visitation with Father and was instructed to apologize to the family for her behavior. According to the child, after the incident, Father called her "stupid idiot," pushed her as she was walking down the stairs, and told her she did not deserve to be loved. She and the other children did chores the next day. In the past, the child spoke with Father about wanting to spend more time with Mother and less time with him, to which Father responded that he was going to exercise parenting time until the child turned eighteen. The child affirmed that all children in Father's household were treated the same, save one boy who gets into trouble more often. She does not fight with Stepmother. She recalled coloring, crafting, playing cards with the adults and the other children, family bike rides, jumping on the trampoline, and playing in the woods when staying at Father's home.

Stepmother's former husband also testified. He related that Father and Stepmother have more parenting time with his and Stepmother's children than he does. He credited Father with doing a "good job" parenting those children. He described a positive family birthday party which took place on November 25, soon after the school incident. Since 2018, he had observed his own children interact with the child and with Father and described the child as "happy" within the family dynamic. He was "very surprised" to hear how the child reacted during the November 22 school incident because "she's never acted anything like that." He stated that the child and her stepsister "are best friends, so I don't see where any of this could be coming from." He was not aware that there had been an argument between Father and the child because the child did not want to give her stepsister her telephone number. The child and her stepsister are the same age.

Next, Father and Stepmother's pastor of five years testified. He agreed that their family attended church services and activities regularly. The pastor testified that Father teaches the middle school students at the church and that he had been chosen to become a deacon soon. The pastor recalled meeting with Father and the child on November 22, after the school pick up incident. He related that Father was extremely concerned that the child was being turned against and pulled away from him. At the meeting, the pastor asked to speak with the child privately. The child was distraught. She stated that she was afraid of Father because he had spanked her one time for discipline. The child told the pastor that she did not have her mobile phone that weekend and that she was not going to share her Apple watch password with Father because it was none of his concern. The pastor advised the child that when his own children were her age, he had all of their passwords "strictly as protection for them." Two days later, at church, the pastor checked on the child and noted that she did not seem sad.

Next, the child's paternal grandfather testified. He recalled attending the child's soccer matches at which both Mother and Father were present. He did not recall Father cursing at Mother or being within arm's reach of her.

Next, Stepmother testified. She and Father have been married seven years. Stepmother stated that she has a loving relationship with the child. In her opinion, all of the children in the household are treated the same. If one child is assigned chores, all of them are. As to the knife incident, Stepmother related that Father was upset because the child stated that she was directed not to share her telephone number with her stepsister who had just received a new phone. In Stepmother's view, "it was about teaching [the child] . . . if your mom is in the wrong of doing something and you want to be able to give your [step]sister a number, you should be able to communicate with your mom that you feel that that's wrong." Stepmother denied ever spanking the child and stated that Father had not spanked her since "probably third grade." She shared that she and Father implement other disciplinary measures such as grounding and limiting technology. Stepmother stated that it had been two years since the child brought her phone to Father's home. Now that the stepsister had a phone, Father encouraged the child to bring hers as well. Stepmother denied that Father had ever shaken, dragged, insulted, cursed at, or pushed the child down the stairs. She stated that she and Father had been reported at least seven times to child protective services. Each time, there was no follow-up or concern on the part of child protective services. In Stepmother's view, the child's soccer matches are stressful due to the dynamic between the child's parents. She stated that when she and Father try to congratulate the child post-match, "she's constantly being called [] get back over here, let's go now, and it's not even been two minutes that we've got to talk to her." When recalling the November 22 weekend visitation, Stepmother remembered that the child's only punishment for the school incident was an early bedtime that night and loss of Apple watch privileges. The rest of the weekend, the child did not seem stressed. During that weekend, the child, Stepmother, Father, the child's paternal grandparents, Stepmother's former in-laws, Stepmother's mother, and the other children dined together at a restaurant to celebrate two birthdays and an early Thanksgiving. Stepmother explained that, during the previous school year, the child wanted to learn to shave her legs because her stepsister had learned, but that otherwise there existed no issue about shaving. She agreed that Father often has someone accompany him when exchanging the child with Mother or he meets Mother at a gas station with security cameras because they "can't get along." Stepmother and Father jointly agree that the child would benefit from counseling. On cross examination, Stepmother admitted to telling the child during the November 22 incident, "if you don't get in the truck with your father I am going to pick up [your stepsister] and I am going to drive down to the school and your dad and I are going to carry you out and put you in the truck."

Father testified next. He explained that there was "no turmoil whatsoever" from July 2024 until the November 22 school incident, which is why he was caught off guard

when the child refused to go home with him. He denied acting with anger or hatred and explained, "It was nothing more than me simply stating [to the child], 'I don't know why you're acting this way, but if it's over the fact that you're not going to spend time with your cousins that are flying up, I'm sorry, but we got to go.'" Father confirmed Stepmother's account of the knife incident. He told the child, "If I were to tell you to go over there and stab [Stepmother], would you do it?" When the child responded, "no," Father responded, "Just because somebody tells you to do certain things don't mean that you should always do it."

Following the hearing, the trial court dismissed the petition for failure to prove the allegations by order entered December 17, 2024. The trial court handwrote its findings and incorporated them into the order. The court characterized the petition as another attempt to change the parenting plan, noting that the parties have been in court, adverse to each other, for years. The trial court found that the parties were "trying to make this a custody case." The court observed that each parent consistently wants to dominate the other, often over insignificant issues such as who fills out the child's soccer paperwork. The trial court noted the parties' agreement that child protective services would assess the child and that she would undergo counseling which would serve her best interest. The parties were ordered to follow the non-custodial family permanency plan. The court credited Ms. Brown's testimony that both parents need to communicate better, and reiterated its previous warnings to the parents that the child would not be "emotionally healthy" otherwise. Upon post-hearing review of Mother's petition, the court found that it contained misleading statements, exaggerations, and broad generalizations, some of which were based on events that took place in 2023. As to the knife incident, the court noted that Mother knew about it in August 2024 but waited until December to petition for an order of protection based on those facts. The court found that the child did not point to any physical abuse by Father over the previous several months. The court found there was no evidence of Father threatening the child. In the trial court's view, the parents' tense behavior at the child's soccer matches were embarrassing to her. The court found that the proof established that the child was upset on November 22, 2024, and did not want to go to Father's home, but that the exact reason was unclear. The court concluded that Mother failed to prove that Father abused the child. The court further concluded that Mother did not prove that Father pushed, spit on, bullied, stepped on her shoes, or insulted her. The court found that Mother did not prove she was in danger of imminent and irreparable harm. Mother appealed.

## II. ISSUES

Mother raises two issues on appeal:

A. Whether the trial court abused its discretion by applying an incorrect legal standard to the petition for an order of protection.

B. Whether the trial court erred in failing to find that Mother established by a preponderance of the evidence that she and the child need protection from Father's psychological and physical abuse.

## III.    STANDARD OF REVIEW

A trial court may extend an ex parte order of protection "if the petitioner has proved the allegation of domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense by a preponderance of the evidence." Tenn. Code Ann. § 36-3-605(b).  "Proving an allegation by a preponderance of the evidence requires a litigant to convince the trier-of-fact that the allegation is more likely true than not true." *McEwen v. Tenn. Dep't of Safety*, 173 S.W.3d 815, 825 n.19 (Tenn. Ct. App. 2005) (citing *Austin v. City of Memphis*, 684 S.W.2d 624, 634–35 (Tenn. Ct. App. 1984)).

We review this non-jury case de novo upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d).  This presumption of correctness applies only to findings of fact and not to conclusions of law. *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).  The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011).

## IV.    DISCUSSION

### A. & B.

Orders of protection are statutorily governed by Tennessee Code Annotated section 36-3-601, *et seq*.  The stated purpose of the statutes was

> to recognize the seriousness of domestic abuse as a crime and to assure that the law provides a victim of domestic abuse with enhanced protection from domestic abuse.  A further purpose of this chapter is to recognize that in the past law enforcement agencies have treated domestic abuse crimes differently than crimes resulting in the same harm but occurring between strangers.  Thus, the general assembly intends that the official response to domestic abuse shall stress enforcing the laws to protect the victim and prevent further harm to the victim, and the official response shall

communicate the attitude that violent behavior is not excused or tolerated.

Tenn. Code Ann. § 36-3-618.  Pursuant to section 36-3-602(a), a domestic abuse victim[1] may seek relief from the courts pursuant to Title 36 when such person "has been subjected to, threatened with, or placed in fear of, domestic abuse."  Tenn. Code Ann. § 36-3-602(a).  Abuse is defined as:

(A) Inflicting, or attempting to inflict, physical injury on an adult or minor by other than accidental means;

(B) Placing an adult or minor in fear of, or in, physical harm or physical restraint;

(C) Causing malicious damage to the personal property of the abused party; or

(D) Intentionally engaging in behavior that amounts to financial abuse[.]

Tenn. Code Ann. § 36-3-601.  Persons within the category of "domestic abuse victim" include adults who are former spouses, adults or minors who have lived together, and minor children of formerly married adults.  *See* Tenn. Code Ann. § 36-3-601(5).  "In order to establish domestic abuse qualifying as a legal ground to extend an order of protection, a petitioner merely has to show fear of physical harm.  Proof of actual physical abuse is not required."  *Mullins v. Hernandez*, No. E2017-00356-COA-R3-CV, 2018 WL 1091737, at *3 (Tenn. Ct. App. Feb. 27, 2018) (citation omitted).

On appeal, Mother assigns as error the trial court's finding that Mother did not prove she was in danger of imminent and irreparable harm.  Mother is correct that "all that the petitioners were required to prove was fear of physical harm."  *See* Tenn. Code Ann. § 36-3-601(1)(B).  However, her argument overlooks the remainder of the trial court's many, thorough factual findings and legal conclusions.  Upon review, we have determined that the trial court applied the correct legal standard in its decision on the petition for an order of protection, and we discern no reversible error on this issue.

Additionally, Mother argues that more than sufficient evidence was presented to the trial court to substantiate the child's fear of physical harm by Father.  "The determination of the preponderance of the evidence regarding allegations of abuse is largely fact-driven, and dependent on credibility, including demeanor assessments."  *Long v. Brown*, No. E2013-00802-COA-R3-CV, 2014 WL 295713, at *5 (Tenn. Ct. App. Jan. 28, 2014).  "We

---

[1] A petition filed on behalf of an unemancipated minor may be presented by a parent or guardian. Tenn. Code Ann. § 36-3-602(b).

give great weight to a trial court's factual findings based on witness credibility because the trial court observed the witnesses." *Honeycutt ex rel. Alexander H. v. Honeycutt*, No. M2015-00645-COA-R3-CV, 2016 WL 3662166, at *4 (Tenn. Ct. App. June 30, 2016) (citing *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997)). Here, after weighing the testimony of the many witnesses and observing their demeanor, the trial court specifically found that Mother's petition contained misleading statements, exaggerations, and broad generalizations. The testimony provided certainly established the contentious nature of Mother's and Father's relationship and the embarrassment and genuine stress this causes their teenage child. However, the evidence adduced at the hearing simply does not meet the standard of abuse for which an order of protection is warranted, as set forth in Tennessee Code Annotated sections 36-3-601 and -605. Giving proper deference to the trial court's assessment of witness credibility, we have determined that the evidence does not preponderate against the trial court's factual findings. Based on this record, we conclude that Father did not abuse Mother or the child as defined by Tennessee Code Annotated section 36-3-601. Accordingly, we affirm the trial court's order dismissing the petition for an order of protection.

## V. CONCLUSION

We affirm the judgment of the trial court. The case is remanded for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are taxed to the appellant, Angela Lydtin.

_____
JOHN W. McCLARTY, JUDGE

- 9 -